1   Debra I. Grassgreen (CA Bar No. 169978)
2   Maxim B. Litvak (CA Bar No. 215852)
    PACHULSKI STANG ZIEHL & JONES, LLP
3   150 California Street, 15th Floor
    San Francisco, California  94111-4500
4   Telephone: 415/263-7000
    Facsimile:  415/263-7010

Attorneys for Debtors and Debtors-in-Possession

Debra I. Grassgreen (CA Bar No. 169978)
Maxim B. Litvak (CA Bar No. 215852)
PACHULSKI STANG ZIEHL & JONES, LLP
150 California Street, 15th Floor
San Francisco, California  94111-4500
Telephone: 415/263-7000
Facsimile:  415/263-7010

Attorneys for Debtors and Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>**DOYLE D. HEATON and**<br>**MARY K. HEATON,**<br><br>          Debtors. | Case No.: 10-40297 EDJ<br><br>Chapter 11<br><br>**DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION PROPOSED BY THE DEBTORS**<br><br><u>Plan Confirmation Hearing</u>:<br><br>Date:  _____, 2010<br>Time:  _____ __.m.<br>Place:  Courtroom 215<br>        1300 Clay Street<br>        Oakland, CA 94612<br>Judge: Hon. Edward D. Jellen |

**SECTION 1125(B) OF THE BANKRUPTCY CODE PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN UNLESS A COPY OF THE PLAN, OR A SUMMARY THEREOF, IS ACCOMPANIED OR PRECEDED BY A COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT.  THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND, THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.  NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO SUCH LAW AND RULES.**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **I. INTRODUCTION** | | 1 |
| A. | SUMMARY OF THE PLAN | 2 |
| B. | VOTING INSTRUCTIONS | 6 |
| | 1. How to Vote | 6 |
| | 2. Who May Vote | 7 |
| C. | CONFIRMATION | 7 |
| **II. DEBTORS' CHAPTER 11 CASE** | | 8 |
| A. | EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 PETITION | 8 |
| | 1. Description and History of the Debtors and Their Homebuilding Business | 8 |
| | 2. Downturn in the Homebuilding Industry | 10 |
| | 3. The Debtors' Financial Status | 11 |
| | 4. Attempts to Reorganize | 11 |
| | 5. The Debtors' Bankruptcy Filing | 12 |
| B. | SIGNIFICANT POST-PETITION EVENTS | 13 |
| | 1. Employment of Debtors' Professionals | 13 |
| | 2. Appointment of Creditors' Committee | 13 |
| | 3. Filing of Schedules and Setting of Claims Bar Date | 13 |
| | 4. Meeting of Creditors | 14 |
| | 5. Debtors' Motion to Use Cash Collateral Consisting of Rental Proceeds | 14 |
| | 6. Case Status Conference | 15 |
| | 7. Debtors' Motion to Limit Scope of Notice | 15 |
| | 8. Litigation with CV Anthony II, LLC | 15 |
| | 9. Debtors' Motion to Approve Settlement with Wells Fargo | 16 |
| **III. DEBTORS' ASSETS AND LIABILITIES** | | 17 |
| A. | ESTATE ASSETS | 17 |
| | 1. Debtors' Cash | 17 |
| | 2. Debtors' Interests in Development Entities | 18 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| | 3. | Debtors' Interests in Rental Properties and Vacant Lot | 23 |
| | 4. | Debtor Retained Assets | 23 |
| B. | | ESTATE LIABILITIES | 25 |
| **IV. RESOLUTIONS INCORPORATED IN THE PLAN** | | | **26** |
| A. | | WELLS FARGO | 26 |
| B. | | DEBTOR TRUSTS | 26 |
| C. | | BANK OF MARIN/HERITAGE BANK | 28 |
| **V. DESCRIPTION OF PLAN** | | | **30** |
| A. | | CLASSIFICATION OF CLAIMS AND INTERESTS | 30 |
| | 1. | Class 1 Claims (Priority Non-Tax Claims). | 30 |
| | 2. | Class 2 Claims (Secured Claims Against Truckee Property) | 30 |
| | 3. | Class 3 Claims (Bank of Marin Secured Claims) | 30 |
| | 4. | Class 4 Claims (Heritage Bank Secured Claims) | 30 |
| | 5. | Class 5 Claims (Miscellaneous Secured Claims) | 30 |
| | 6. | Class 6 Claims (Wells Fargo Claims). | 30 |
| | 7. | Class 7 Claims (General Unsecured Claims). | 30 |
| | 8. | Class 8 Interests. | 30 |
| B. | | TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS | 31 |
| | 1. | Class 1 (Priority Non-Tax Claims) | 31 |
| | 2. | Class 2 (Secured Claims Against Truckee Property) | 31 |
| | 3. | Class 3 (Bank of Marin Secured Claims) | 31 |
| | 4. | Class 4 (Heritage Bank Secured Claims) | 32 |
| | 5. | Class 5 (Miscellaneous Secured Claims) | 33 |
| | 6. | Class 6 (Wells Fargo Claims) | 34 |
| | 7. | Class 7 (General Unsecured Claims) | 35 |
| | 8. | Class 8 (Interests) | 35 |
| C. | | TREATMENT OF UNCLASSIFIED CLAIMS | 35 |
| | 1. | Administrative Claims. | 36 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | |
|---|---|---|---|
| | 2. | Priority Tax Claims. | 36 |
| | 3. | Claims for Professional Fees. | 36 |
| **VI. IMPLEMENTATION OF THE PLAN** | | | **37** |
| A. | REVESTING AND LIQUIDATION OF ESTATE ASSETS | | 37 |
| B. | REVESTING OF DEBTOR RETAINED ASSETS | | 37 |
| C. | ROLE OF PLAN REPRESENTATIVE | | 37 |
| D. | DEBTORS' POWERS AND AUTHORITY | | 38 |
| | 1. | Generally. | 38 |
| | 2. | Responsibility and Authority of Debtors. | 39 |
| | 3. | Powers of Debtors. | 39 |
| | 4. | Compensation of Debtors and Professionals. | 40 |
| E. | LICENSE AND OVERHEAD | | 41 |
| F. | ABANDONMENT | | 41 |
| G. | FINANCING | | 41 |
| H. | AVAILABLE CLAIMS AND/OR DEFENSES | | 42 |
| I. | WELLS FARGO SETTLEMENT AGREEMENT | | 43 |
| J. | DEBTOR TRUSTS | | 43 |
| K. | DEATH OR INCAPACITY OF DEBTORS | | 43 |
| L. | DISSOLUTION OF THE CREDITORS' COMMITTEE | | 43 |
| M. | FINAL DECREE | | 44 |
| **VII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES** | | | **44** |
| A. | REJECTION OF CONTRACTS AND LEASES | | 44 |
| B. | BAR DATE FOR REJECTION DAMAGES | | 44 |
| **VIII. EFFECTS OF CONFIRMATION** | | | **45** |
| A. | BINDING EFFECT | | 45 |
| B. | PROPERTY REVESTS FREE AND CLEAR | | 45 |
| C. | DISCHARGE | | 45 |
| D. | PERMANENT INJUNCTION | | 46 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1    E.    EXONERATION AND RELEASE ................................................................. 47

2  **IX. KEY PLAN PROVISIONS** ......................................................................... **47**

3    A.    SOURCE OF PLAN FUNDING ........................................................... 47

4    B.    PRIORITY CLAIMS ............................................................................ 47

5    C.    ADMINISTRATIVE CLAIMS .............................................................. 48

6  **X. FEASIBILITY** ................................................................................................. **48**

7  **XI. RISK FACTORS** ............................................................................................ **48**

8  **XII. CERTAIN FEDERAL TAX CONSEQUENCES** ......................................... **49**

9    A.    TAX CONSEQUENCES OF PLAN ....................................................... 49

10   B.    FEDERAL INCOME TAX CONSEQUENCES TO CREDITORS ...................... 50

11   C.    FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS.................. 51

12  **XIII. LIQUIDATION ANALYSIS** ...................................................................... **52**

13  **XIV. CONCLUSION** ........................................................................................... **54**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

SF:69980.2    iv    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# I.

# **INTRODUCTION**

Doyle D. Heaton and Mary K. Heaton, a married couple (the "Debtors"), jointly submit this Disclosure Statement pursuant to section 1125 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the *Joint Plan of Liquidation Proposed by the Debtors*, dated March 24, 2010, as the same may be amended (the "Plan"), filed by the Debtors in the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan that is scheduled for _____ __, 2010 at __:__ _.m.  Unless otherwise defined, capitalized terms contained herein shall have the same meanings set forth in the Plan.

On or about _____ __, 2010, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment on whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.  Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions.  There can be no assurance that such statements will reflect actual outcomes.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.

This Disclosure Statement is for the purpose of enabling you to make an informed judgment about the Plan.  You are urged to review both this Disclosure Statement and the Plan in making your decision about whether to accept the Plan.  Based on the information contained in this Disclosure Statement and for the reasons set forth below, the Debtors have concluded that the Plan provides the best and most rapid recovery to Creditors.

In addition, a ballot for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement submitted to those holders of Claims that the Debtors believe are entitled to

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   vote to reject or accept the Plan.  The Debtors urge you to accept the Plan by completing and

2   returning the enclosed ballot so that it is received by no later than 4:00 p.m., prevailing Pacific

3   Time, on _____ __, 2010.

4   **A.      SUMMARY OF THE PLAN**

5          Mr. Heaton is a prominent real estate developer in the Bay Area with over 40 years of

6   experience in the residential housing industry.  Like many other developers, many of Mr. Heaton's

7   projects ran into financial problems over the last few years given the unprecedented and sustained

8   downturn in the housing market.  Currently, most of Mr. Heaton's real estate holdings are

9   "underwater" (*i.e.*, the amount of the outstanding secured debt exceeds the value of the property).

10  Although these developments are generally held through separate, non-debtor development entities

11  (together, the "Development Entities"), Mr. Heaton is responsible as guarantor for any

12  deficiencies.  The Development Entities are listed in Exhibit A to the Plan and described further in

13  Section III.A.2 below.

14         The Debtors estimate having potential unsecured liabilities (including contingent claims on

15  account of various guarantees) that aggregate nearly $120 million.  The Debtors believe that the

16  pool of unsecured claims asserted against the estate will be significantly reduced by virtue of value

17  recovered from the assets of the Development Entities, but deficiencies are likely to remain.  The

18  Debtors' detailed projections of anticipated recoveries from the assets of the Development Entities,

19  in both a chapter 7 scenario and under the Plan, are set forth in **Exhibit A** hereto.  Under the Plan,

20  the Debtors project that the unsecured creditor pool can be reduced to approximately $12 million.

21         Given the Debtors' experience and knowledge with respect to the real estate business

22  generally and the various projects held through the Development Entities specifically, the Debtors

23  believe that creditors will realize a substantially greater return in this case through the Debtors'

24  continued involvement with the liquidation of the Estate Assets and the assets of the Development

25  Entities.  By maximizing recoveries at the Development Entities, which the Debtors propose to do

26  under the Plan, guarantee claims against this estate will be minimized as much as possible.  The

27  alternative approach would be to surrender the assets of the Development Entities to applicable

28  secured creditors who would then likely foreclose on their collateral and dispose of these assets

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

through an expedited sale process. The Debtors estimate that such a liquidation effort will cause creditors to suffer an impairment associated with the assets of the Development Entities equal to at least 25% in value.

The Plan also incorporates and implements a settlement with Wells Fargo Bank, N.A. ("Wells Fargo"), which was approved by the Bankruptcy Court by separate order dated _____, 2010. Absent the settlement, Wells Fargo would have been the largest creditor in these cases with potential contingent claims totaling up to $70 million, most of which relate to guarantees arising in connection with certain of the Development Entities. As part of the settlement, Wells Fargo waived any guarantee and/or loan claims that it may have against the Debtors or this estate. Absent the settlement, the Debtors estimated that Wells Fargo would have had unsecured claims totaling approximately $36 million against this estate, which would have the effect of substantially diluting the unsecured creditor pool and thereby reducing recoveries by other general unsecured creditors by 75% or more. Under the settlement, Wells Fargo reserved its rights as a secured creditor arising under certain second deeds of trust against several of the Debtors' residential rental properties and a financing statement against the Debtors' interests in one of the Development Entities, Mardel LLC, in which the Debtors do not anticipate having any equity. Wells Fargo has been released of any and all claims, including avoidance actions, by the Debtors or the estate.

In terms of assets, the Debtors' estate is primarily comprised of cash, interests in the Development Entities, and certain residential rental properties and a vacant lot in Walnut Creek. For purposes of the Plan, the Debtors project having $1.4 million of cash available as of the Effective Date, prior to payment of any professional fees that may be incurred during this case following the Petition Date. As noted above, the Debtors do not expect to realize any equity value out of the bulk of their investments in the Development Entities. One exception is Mr. Heaton's interest in an entity called Clover DHDA, LLC, in which Mr. Heaton has a 29.958% membership interest. The Debtors project as part of the Plan that this interest could generate $3.1 million in distributions over a period of two to three years, minus a 20% success fee that would be payable to the Debtors under the Plan. The majority of distributions to unsecured creditors under the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  will come from this one asset.  As for the Debtors' interests in residential rental properties and

2  vacant lot, these assets are heavily leveraged and are not expected to generate any value for

3  unsecured creditors.

4        In order to maximize value for all constituents, the Plan contemplates that the Debtors'

5  assets -- the Estate Assets -- will be administered by the Debtors for the benefit of creditors under

6  the supervision of a Plan Representative, with the exception of certain limited and specifically

7  identified assets -- the Debtor Retained Assets -- that will be retained by the Debtors for their own

8  personal benefit from and after the Effective Date of the Plan.[1]  Specifically and subject to the

9  oversight of the Plan Representative, the Debtors will be charged with the task of maximizing

10  recoveries out of the Estate Assets, minimizing Claims arising from the Debtors' guarantee

11  obligations in connection with the Development Entities, reconciling Claims against the Estate,

12  and making distributions to Creditors in accordance with the priorities set forth in the Plan.

13        The chart below reflects the Debtors' best estimate of the total amount of Claims that may

14  be allowed against the Estate, and summarizes the treatment of, and recoveries that can be

15  anticipated by holders of Claims and Interests under the Plan.  The amounts listed below are

16  estimates only.

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OR VALUE OF CLAIMS | ESTIMATED RECOVERY PERCENTAGE | TREATMENT |
|---|---|---|---|---|
| N/A | Allowed Administrative Claims | $300,000 | 100% | Payment in full. *(Not entitled to vote)* |

---

[1]  The Debtor Retained Assets consist of the following assets:  (a) the Walnut Creek Property (held through the Doyle D. Heaton Qualified Personal Residence Trust Walnut Creek and the Mary K. Heaton Qualified Personal Residence Trust Walnut Creek); (b) the Truckee Property (held through the Doyle D. Heaton Qualified Personal Residence Trust Truckee); (c) the Debtors' rights and interests in SCG Builders, Inc.; (d) the Debtors' rights and interests in DRG Builders, Inc.; (e) the Debtors' rights and interests in a Class B, California Contractor's License No. 386387; (f) the Debtors' rights and interests in the Doyle D. Heaton and Mary K. Heaton Irrevocable Trust dated May 28, 1991; (g) the sum of $55,000 in Cash previously held in the Doyle D. Heaton Alaska Trust; and (h) all retirement and pension benefits and household goods, vehicles, jewelry, artwork, clothing, and other personal items of the Debtors or the Estate, including all property claimed as exempt in the Schedules and the Debtors' interests in a boat and trailer listed in the Schedules.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | | | | |
|---|---|---|---|---|
| | Allowed Priority Tax Claims | $66,436 | 100% | Payment in full. *(Not entitled to vote)* |
| 1 | Allowed Priority Non-Tax Claims | $0 | 100% | Payment in full. *(Not entitled to vote)* |
| 2 | Secured Claims Against Truckee Property | $271,519 | 100% | Assumption by Debtors. *(Not entitled to vote)* |
| 3 | Bank of Marin Secured Claims | $298,857 as to first deed of trust, and $579,167 as to second deed of trust, against Walnut Creek Vacant Lot; | See Exhibit A | Value of Walnut Creek Vacant Lot, subject to the Lot Line Adjustment; plus $55,000 in cash; and value of Debtors' interests in Corona Road Associates, LLC and Adobe Partners, LLC. Bank of Marin will have no unsecured deficiency claims against the estate as to the Walnut Creek Vacant Lot, but will retain any other available General Unsecured Claims against the estate. *(Entitled to vote)* |
| 4 | Heritage Bank Secured Claims | $2,435,000 as to second deeds of trust (including second deed of trust against Walnut Creek Property)  $787,000 as to first deed of trust against Walnut Creek Property | See Exhibit A    100% | Value of real property and improvements collateralizing the second deeds of trust of Heritage Bank; plus any available rental proceeds and the Heritage Bank Interest Reserve; and an allowed unsecured deficiency claim in an amount not to exceed $400,000. Heritage Bank's first deed of trust against the Walnut Creek Property will be reinstated subject to a three-year extension of the maturity date. Upon performance under Plan, Heritage Bank shall release its second deed of trust against the Walnut Creek Property. *(Entitled to vote)* |

| 5 | Miscellaneous Secured Claims (each secured creditor in a separate class identified as Class 5A, Class 5B, etc.) | $7,415,002, which amount is net of Bank of Marin, Heritage Bank and Wells Fargo) | See Exhibit A | Abandonment of collateral, cash payment equal to value of collateral, or retention of rights that existed pre-bankruptcy. *(Entitled to vote)* |
| 6 | Wells Fargo Claims | Up to $70,439,071 (Wells Fargo's unsecured claims have been released under the Wells Fargo Settlement Agreement) | Not applicable | Rights and benefits under Wells Fargo Settlement Agreement, plus value of real property and improvements collateralizing certain of the Wells Fargo Claims. *(Entitled to vote)* |
| 7 | Allowed General Unsecured Claims | Up to $118,661,304, but expected to total $11,786,316 under Plan | 26% | Distribution of Pro Rata share of the Net Proceeds of the Estate Assets that remain available after taking into account the treatment of Claims in Classes 1-6 above. *(Entitled to vote)* |
| 8 | Interests | N/A | N/A | Retention of the Debtor Retained Assets and the right to earn fees and compensation as set forth in the Plan. *(Not entitled to vote)* |

The Debtors estimate that the liquidation of the Estate Assets, as part of the Plan and through the efforts of the Debtors, will result in distributions of approximately $55 million to the secured creditors of the Development Entities, which will have the effect of substantially reducing guarantee claims against the estate.

**B.      VOTING INSTRUCTIONS**

**1.      How to Vote**

A ballot is enclosed herewith for Creditors to use in voting on the Plan. For the reasons described herein, holders of Interests will not receive a ballot. To vote on the Plan, indicate on the enclosed ballot that you accept or reject the Plan, provide the requested information, sign your name and mail the ballot in the envelope provided for this purpose.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

In order to be counted, ballots must be completed, signed and returned so that they are actually received no later than 4:00 p.m., prevailing Pacific Time, on _____ __, 2010, at the following address:

> Pachulski Stang Ziehl & Jones LLP
> 150 California Street, 15th Floor
> San Francisco, California 94111-4023
> Attn: Patricia J. Jeffries – Ballot Administrator

If your ballot is not properly completed, signed and returned as described, it will not be counted. If your ballot is damaged or lost, you may request a replacement by sending a written request to this same address.

**2.** **Who May Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or interests in classes of claims or interests that are impaired and that will receive distributions under a plan are entitled to vote to accept or reject a proposed plan. Holders of Class 3 Claims (Bank of Marin Secured Claims), Class 4 Claims (Heritage Bank Secured Claims), Class 5 (Miscellaneous Secured Claims), Class 6 Claims (Wells Fargo Claims) and Class 7 Claims (General Unsecured Claims) are impaired under the Plan and, to the extent Claims in such Classes are Allowed Claims, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in Classes 3, 4, 5, 6 and 7 are entitled to vote to accept or reject the Plan. Classes 1 and 2 of the Plan are unimpaired and, as a result, are not entitled to vote on the Plan. Class 8, consisting of the Debtors' Interests, is impaired under the Plan, however, the Debtors are not entitled to vote on the Plan. Based on the foregoing, the Debtors are soliciting acceptances only from holders of Allowed Claims in Classes 3, 4, 5, 6 and 7.

**C.** **CONFIRMATION**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, if the Bankruptcy Court determines that all of the requirements of section 1129 of the Bankruptcy Code have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtors believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code, including that the Plan has been proposed in good faith and not by any means forbidden by law.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Voting is tabulated by Class. A class of Creditors has accepted the Plan if the Plan has been accepted by at least 2/3 in dollar amount and more than 1/2 in number of Creditors holding Allowed Claims in that class who actually vote to accept or reject such Plan.

Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" as to each nonaccepting class.

The Bankruptcy Court has set _____ __, 2010, at __:_0 _.m. for the Confirmation Hearing at which it will determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing may be continued from time to time and day to day without further notice. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors, counsel for the Creditors' Committee, and the Office of the United States Trustee on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan.

## II.

## DEBTORS' CHAPTER 11 CASE

### A.  EVENTS LEADING UP TO THE FILING OF THE CHAPTER 11 PETITION

#### 1.  Description and History of the Debtors and Their Homebuilding Business

The Debtors are individuals. Mrs. Heaton is a part-time aerobics instructor and occasionally works in the antiques industry.

Mr. Heaton is a 1963 graduate of the University of Denver. He has been involved in the development of residential housing in the San Francisco Bay Area for more than 40 years. At various times, he has been Chairman of the Building Industry Association of Northern California (the "BIA") and Chairman of the BIA Builders for Affordable Housing Committee. In 2001, the BIA inducted Mr. Heaton into the Builders Hall of Fame. Mr. Heaton is actively involved in a number of civic organizations, including the local Chamber of Commerce and the De La Salle High School Board of Regents.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Mr. Heaton founded Delco Builders and Developers, Inc. ("Delco Builders") as a California corporation in 1977 to develop land, build homes and market single-family residential developments located in Northern California. During the past 15 years, the Delco Builders' family of companies, which includes the Development Entities further described below in Section III.A.2, has developed or built over 1,000 new homes and residential lots located in many cities throughout the Bay Area. Delco Builders is not a debtor in these proceedings.

During the 1980s, Delco Builders focused on developing a handful of select new residential communities located in "in-fill" markets in the Bay Area. These markets were characterized by high quality of life attributes such as good public schools, close proximity to employment centers and convenient access to private and public transportation. These markets also shared the characteristic of having limited supplies of developable land because of restrictive local planning ordinances and well-defined urban growth boundaries. Financing for these development projects was obtained from private equity investors as well as regional commercial banks. The recession of 1991 forced Delco Builders to change its business plan, pull back from many of its projects and sell off land inventories to repay lenders and investors. Once this was completed, Delco Builders began acquiring select in-fill development sites in the mid 1990s and restarted its building activities with a string of successful development projects.

In 1995, Mr. Heaton formed an investment company to own and develop many of Delco Builders' new land development and construction projects. Wells Fargo made a sizeable investment in this company in the form of an unsecured credit line giving it the liquidity and financial strength to acquire larger residential development projects in the Bay Area. With this and other financing in place, Delco Builders completed more than 25 successful housing development projects and grew its operations into a company employing nearly 40 professionals, with annual sales reaching approximately $100 million by 2004. Much of the profits generated by these successful development activities were reinvested from 2000-2006 into new land development projects and Mr. Heaton's substantial rental housing investment portfolio.

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**2.** **Downturn in the Homebuilding Industry**

The homebuilding industry in the United States has experienced a significant and sustained decrease in demand for new homes resulting in an oversupply of new and existing homes available for sale. The negative impact of these demand and supply trends was compounded by recent difficulties in the mortgage and overall credit markets and the rising trend of mortgage defaults, especially in the subprime market. Those difficulties have harmed developers and homebuilders by further increasing the supply of housing inventory, negatively impacting pricing conditions, decreasing the demand for homes, and dampening customer confidence.

Beginning around mid-2007, the majority of residential homebuilders nationwide began to experience a significant decrease in their home sales and operating results, which occurred because of a decrease in the net sales prices able to be achieved in each community, combined with a slower absorption rate of sales that was a direct consequence of potential home buyers (a) waiting to make a purchase until there was a perceived bottom in the deterioration of real estate values, and (b) finding it more difficult to obtain affordable mortgage financing. The market deterioration has been particularly sudden and steep in California.

Delco Builders has been adversely affected by this severe downturn in the residential housing market. The over-supply of new residential development, coupled with the national "sub-prime" problem created a depressed market for residential housing assets. Sales slowed dramatically on existing projects and the pricing environment for houses has deteriorated significantly (in some markets more than 30%). As a result, Delco Builders' core business of building and selling new homes became highly unprofitable. Access to the traditional debt and equity markets for builders and developers also evaporated. This situation has left Delco Builders with no viable market to sell considerable land inventory in order to generate cash flow and repay lenders, and no opportunities to refinance existing loans to extend maturity dates and replenish interest reserves. Mr. Heaton has used his personal resources to keep his company and its development projects afloat over the past few years, and now has limited liquidity.

Mr. Heaton estimates that, as of December 31, 2007, his net worth was approximately $41 million. One year later, Mr. Heaton's December 31, 2008 statement of financial condition reflects

that his net worth was approximately $11 million (based on a settlement agreement with Wells Fargo Bank that was then pending and actually executed in April 2009). As of the Petition Date, Mr. Heaton estimates that he has substantial negative net worth.

Given the precarious financial condition of Delco Builders, Mr. Heaton (along with other partners) created a new company, DRG Builders, Inc. ("DRG"), in November 2008 to manage various ongoing real estate developments. DRG is not a debtor in these proceedings.

### 3. The Debtors' Financial Status

Mr. Heaton has personally guaranteed most of the loans owing on real estate projects owned through the Development Entities. A number of these loans are currently in default and Mr. Heaton's guarantee obligations thereunder have been triggered. The Debtors also have other outstanding borrowings that may be due and owing to third party creditors. In sum, as of the commencement of this case, the Debtors estimated that their outstanding unsecured debt totaled up to approximately $118 million and that their outstanding secured debt totaled up to approximately $13 million. The Debtors' largest unsecured creditor was Wells Fargo Bank with claims that could have totaled as much as $70 million, in the absence of the Wells Fargo Settlement Agreement.

The Debtors have limited liquid assets to satisfy outstanding Claims. As of the Petition Date, the Debtors, either directly or through various self-settled trusts, have approximately $1.4 million in cash. The Debtors also have interests in various real estate development entities and single-family residential rental properties. The Debtors believe that most of these interests are "underwater" in that the amount of the outstanding secured debt exceeds the present value of these assets. One exception is Mr. Heaton's interest in an entity called Clover DHDA, LLC, in which Mr. Heaton has a 29.958% membership interest. As further described below in Section III.A.2, the Debtors expect that this interest could generate approximately $3.1 million in distributions over a period of two to three years, which sum, minus a success fee provided under the Plan, would be available for payment to holders of Class 7 General Unsecured Claims.

### 4. Attempts to Reorganize

The Debtors have been proactive during the past 18 months in an effort to reorganize outside of bankruptcy with the support of their creditor constituents. The Debtors have taken major steps to:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(1) downsize and reduce overhead at Delco Builders and DRG, (2) renegotiate debt with lenders and vendors, and (3) develop a revised marketing program to sell standing inventory of completed homes.  Over the past twelve months, the Debtors have effectuated a sale of nearly 40 of the 50 inventory homes owned by various Development Entities and repaid over $25 million of secured debt owed by the Development Entities.  In addition, Mr. Heaton entered into a settlement agreement with Wells Fargo in April 2009 to address his exposure on various personal guarantees.  Mr. Heaton also has been actively involved in negotiations with his other lenders and investors in an effort to craft forbearance agreements and create collateral and asset liquidation plans to satisfy his creditors.

**5.    The Debtors' Bankruptcy Filing**

By using his personal resources to keep Delco Builders and the Development Entities afloat, Mr. Heaton needed to modify his outstanding indebtedness.  From October 2008 through May 2009, Mr. Heaton successfully restructured and modified over $100 million of secured and unsecured loans.  All of his principal lenders were provided copies of:  (a) schedules of outstanding debt that Mr. Heaton had personally guaranteed, (b) Delco Builders' 2009 budget which showed a projected negative $638,000 cash flow deficit, and (c) Mr. Heaton's December 31, 2008 Financial Statement.

Six months after Delco Builders and its projects were stabilized, it became apparent that the California residential real estate market continued to decline.  Although all of the secured and unsecured projects and personal loans were being paid pursuant to the loan modifications, it was clear that due to the leverage associated with the Development Entities and the rental properties, the equity deficiency had increased significantly.  Mr. Heaton had insufficient cash and personal resources to continue "as is."  As a result, in October 2009, Mr. Heaton developed a "Collateral Pool Plan" to maximize payments to secured and unsecured creditors.  The majority of the lenders were in favor of this "Collateral Pool Plan."  However, a few unsecured creditors elected to litigate, which prompted the Debtors' chapter 11 filing.

The Debtors commenced this bankruptcy case in order to prevent and avoid the potential attachment of their property to the detriment of the Debtors and their creditors, and to pursue a reorganization strategy that would maximize recoveries for all constituents.

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B.** **SIGNIFICANT POST-PETITION EVENTS**

On the January 11, 2010 (the "Petition Date"), the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued in the possession of their property and the management of their affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**1.** **Employment of Debtors' Professionals**

The Debtors have employed Pachulski Stang Ziehl & Jones LLP as bankruptcy counsel and Huntley, Mullaney, Spargo & Sullivan, LLC as financial advisors, effective as of the Petition Date. The Debtors also sought to employ various ordinary course professionals pursuant to procedures proposed in a motion filed with the Bankruptcy Court on January 22, 2010, which the Bankruptcy Court approved on _____, 2010.

**2.** **Appointment of Creditors' Committee**

On February 10, 2010, the United States Trustee appointed the Creditors' Committee pursuant to Bankruptcy Code sections 1102(a) and 1102(b)(1). The Creditors' Committee is currently comprised of the following members: (1) CV Anthony II, LLC ("CV Anthony"); (2) John and Andrea Barella; (3) Donna Goldberg; (4) Gonsalves & Santucci, Inc.; and (5) Meadow Creek Group, LLC.

The Creditors' Committee has employed Sheppard Mullin Richter & Hampton LLP as its counsel.

**3.** **Filing of Schedules and Setting of Claims Bar Date**

The Debtors initially filed their Schedules of Assets and Liabilities and Statement of Financial Affairs (together, the "Schedules") and Statement of Current Monthly Income with the Bankruptcy Court on January 25, 2010. The Schedules have since been amended or supplemented. The Schedules, as amended or supplemented, list liabilities totaling approximately $131,955,768 as of the Petition Date. However, this amount does not take into account the Wells Fargo Settlement Agreement and includes the Debtors' total potential exposure under various personal guarantees associated with the Development Entities. The Debtors anticipate that these obligations will be significantly reduced by the value of assets realized at the Development Entities.

As listed, the scheduled liabilities are summarized as follows:

| | |
|---|---|
| Secured Claims: | $13,228,028 |
| Priority Claims: | $66,436 |
| General Unsecured Claims: | $118,661,304 |

The Bankruptcy Court established May 10, 2010, as the Bar Date by which non-governmental Creditors were required to file proofs of Claim against the Debtor's estate, and July 12, 2010, as the Bar Date by which governmental Creditors are required to file proofs of Claim against the Debtor's estate. A Claim filed after the applicable Bar Date will be considered late and may be disallowed.

The deadline to file a complaint to determine the dischargeability of any of the Debtors' debts is April 9, 2010. To date, as addressed in Section II.B.8 below, only CV Anthony has challenged the dischargeability of any debt.

**4.      Meeting of Creditors**

The Debtors appeared and participated in a meeting of creditors administered by the Office of the United States Trustee on February 11, 2010, consistent with section 341(a) of the Bankruptcy Code. The meeting of creditors was concluded on this date.

**5.      Debtors' Motion to Use Cash Collateral Consisting of Rental Proceeds**

On February 10, 2010, the Debtors filed a motion seek to utilize cash collateral in the form of rental proceeds from the Debtors' residential real properties (together, the "Rental Properties") for the purpose of, <u>first</u>, maintaining the Rental Properties; <u>second</u>, paying or reserving for tax obligations relating to the Rental Properties, and <u>last</u>, to the extent of any remaining excess proceeds, distributing the proceeds to the first lien lenders on the Rental Properties to be applied against the Debtors' outstanding obligations to such lenders.

Further, the Debtors sought authority for: (a) any lenders holding interest reserves for the benefit of the Debtors on account of the Rental Properties to utilize, offset or otherwise apply such reserves in their discretion; and (b) any second lien lenders on the Rental Properties to advance funds, in their discretion, to (i) holders of first lien deeds of trust against the Rental Properties for the purpose of paying senior debt service, or (ii) the Debtors for the purpose of maintaining or

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

renovating the Rental Properties for sale (any such advances shall be non-recourse as to the Debtors).

On a monthly basis, the Debtors realize approximately $43,000 in net rental proceeds from all of the Rental Properties combined.  Each of the deeds of trust encumbering the Rental Properties appear to include assignments of rents.  Hence, the rental proceeds collected by the Debtors from the Rental Properties constitute "cash collateral" within the meaning of section 363 of the Bankruptcy Code.

Following a hearing on March 4, 2010, the Court approved this motion.

**6.        Case Status Conference**

Pursuant to an order of the Bankruptcy Court, the Debtors appeared through counsel at a status conference before the Bankruptcy Court on February 11, 2010.  At the status conference, counsel informed the Court as to the status of the case and the Debtors' objectives in connection with a plan.  The Bankruptcy Court has adjourned future status conferences indefinitely, subject to the United States Trustee resetting the matter for hearing on 20 days' notice to the Debtors and parties in interest.

**7.        Debtors' Motion to Limit Scope of Notice**

On February 18, 2010, the Debtors filed a motion to provide notice of certain matters in this case to only a limited number of parties in interest.  The creditor matrix filed by the Debtors in this case contains approximately 240 parties.  Requiring notice to and service upon approximately 240 persons and entities will increase the cost of administering the estate without conferring any meaningful benefit on the Debtors' estate.  Hence, in order to avoid the costs that serving notice of certain pleadings on approximately 240 parties would impose upon the estate while assuring that interested parties receive proper and sufficient notice of all matters, the Debtors proposed to limit notice in the case on certain matters.  By order dated March 23, 2010, the Bankruptcy Court approved this motion.

**8.        Litigation with CV Anthony II, LLC**

On February 26, 2010, CV Anthony commenced an adversary proceeding in the Bankruptcy Court against the Debtors alleging constructive trust, equitable lien, and non-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

dischargeability claims associated with a disputed prepetition debt. The Debtors contest CV Anthony's allegations and intend to vigorously defend against this lawsuit.

On March 5, 2010, CV Anthony filed a motion for relief from stay to continue to pursue a prepetition state court lawsuit against the Debtors and various non-Debtor affiliates. The state court litigation stems from the same facts raised in CV Anthony's adversary proceeding. The Debtors have objected to this motion.

**9.      Debtors' Motion to Approve Settlement with Wells Fargo**

On March 24, 2010, the Debtors filed a motion seeking approval of the Wells Fargo Settlement Agreement. The agreement effectuated a global compromise of the Debtors' obligations under various guarantees, as well as repayment obligations under certain loans, in favor of Wells Fargo in exchange for Wells Fargo's agreed waiver of an estimated $36 million deficiency claim against the Debtors' estate.

Other than the potential Wells Fargo deficiency claim, the Debtors estimate that the pool of general unsecured claims in this case will be reduced to less than $12 million. Hence, Wells Fargo's $36 million claim would have represented approximately 75% of the total claims pool, if such claim were allowed. Wells Fargo potentially could have had claims against the Debtors totaling approximately $70 million, and it was Wells Fargo's position that it was entitled to assert its full $70 million claim against the estate, absent the Wells Fargo Settlement Agreement. Most of these claims stemmed from guarantee obligations against certain Development Entities. Even after taking into account the anticipated value of the assets of these Development Entities, the Debtors projected that Wells Fargo's remaining deficiency claim against the Debtors would be approximately $36 million. In addition, a portion of Wells Fargo's claims were secured by certain of the Debtors' assets, including second deeds of trust against several rental properties.

As part of Wells Fargo Settlement Agreement and in consideration of Wells Fargo's waiver of its guaranty and loan claims, the Debtors' estate:

(a) released any and all claims against Wells Fargo, including avoidance actions such as a potential preference claim for $540,315 paid to Wells Fargo during the 90 days prior to the commencement of this case;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(b)  agreed that the Debtors' prepetition assignment to Wells Fargo of interests in a Development Entity called Oak Brook Partners II, LLC was final and irrevocable (the Debtors had valued such interests at approximately $50,000 to $500,000);

(c)  agreed that the Debtors' prepetition assignment to Wells Fargo of a note owed in the amount of $825,000 by one Development Entity (Clover DHDA, LLC) to another (Mardel, LLC) was final and irrevocable; and

(d)  agreed to cooperate with Wells Fargo in its effort to maximize the value of its claims against certain Development Entities and certain rental properties.

The Wells Fargo Settlement Agreement was approved by order of the Bankruptcy Court on _____, 2010.

**III.**

**DEBTORS' ASSETS AND LIABILITIES**

**A.    ESTATE ASSETS**

The Debtors' assets are set forth in detail in the Schedules and projected recoveries therefrom are summarized in **Exhibit A** hereto.  Generally speaking, the Debtors' assets can be divided into four principal categories as follows: (1) cash; (2) ownership interests in the Development Entities; (3) ownership interests in the Rental Properties and one residential lot; and (4) the Debtor Retained Assets, including exempt assets.  Each of these asset categories is addressed further below:

    **1.    Debtors' Cash**

The Debtors anticipate having approximately $1.4 million of cash available for the benefit of satisfying claims.  The Debtors have also scheduled approximately $10,000 per month in monthly gross wages, but this income is Mr. Heaton's salary from DRG.  Given the liquidity issues presently facing DRG, Mr. Heaton has stopped collecting salary from DRG for services rendered since the Petition Date and such obligations have been accruing on DRG's books and records.

The Debtors' cash includes any tax refunds that may have been received by the Debtors prepetition, to the extent any such funds remain.  The Debtors believe that they have taken advantage

of most available loss carrybacks currently available to them, but reserve the right to seek additional refunds for the benefit of the Estate at a later date.

On January 15, 2009, the Debtors received a tax refund from the Internal Revenue Service in the amount of $2,917,713 for tax year 2005, and $1,058,937 for tax year 2006. The 1045 form as to these refunds (Application for Tentative Refund) was filed on November 7, 2008. The actual 2007 tax return was filed on October 14, 2008. The above-described refunds are the result of a net operating loss carryback calculation on the Debtors' 2007 tax return.

On December 9, 2009, Mr. Heaton received a tax refund of $1,067,413 from the Internal Revenue Service for tax year 2004, and on December 30, 2009, Mr. Heaton received a tax refund of $233,722 for tax year 2003. The 1045 form as to these refunds (Application for the Tentative Refund) was filed on November 17, 2009. These tax refunds are due to net operating loss carryback calculations. Consistent with a prepetition settlement agreement with Wells Fargo, the Debtors paid approximately $540,000 of these funds to Wells Fargo on December 30, 2009. Previously, on September 22, 2009, the Debtors paid $800,000 to Wells Fargo on account of tax refunds received.

The foregoing tax refunds are currently the subject of a pending audit by the Internal Revenue Service. The Debtors intend to have the audit resolved prior to the Effective Date and may employ section 505 of the Bankruptcy Code to obtain a final determination from the Bankruptcy Court as to tax refunds received by the Debtors prepetition. The Debtors believe that they have ample remaining carryforward losses available to them in the unlikely event that there is a need to offset potential additional tax liabilities that could be assessed as a result of the audit.

**2.** **Debtors' Interests in Development Entities**

The Debtors believe that the bulk of their equity interests in the Development Entities are out of the money, with two limited exceptions: Oak Brook Partners II, LLC ("Oak Brook") and Clover DHDA, LLC ("Clover DHDA").

**a.** **Oak Brook**

The Debtors believe that they may realize between $50,000 and $500,000 on account of their 20% ownership interest in an entity called Oak Brook Partners II, LLC ("Oak Brook"). The Debtors' interests in the proceeds to be realized from Oak Brook, however, were pledged to Wells

Fargo as collateral on a prepetition basis and have been irrevocably assigned to Wells Fargo under the Wells Fargo Settlement Agreement. The owners of Oak Brook are currently involved in arbitration proceedings to resolve disputes regarding the value of their respective interests in the assets of that entity. Once this matter is finalized, the Debtors anticipate that their interests in Oak Brook will be liquidated.

**b.** **Clover DHDA**

The Debtors believe that they can realize approximately $3.1 million in the future on account of their 29.958% interests in Clover DHDA. This recovery is speculative and dependent on a successful completion of the entitlement process over the next two to three years and a recovery in the residential housing market. Under the Plan, the Debtors also will be entitled to collect a success fee equal to 20% of the anticipated recoveries from Clover DHDA (projected at $629,461 per Exhibit A hereto). The Debtors believe that a recovery from Clover DHDA is only possible with the continued involvement and participation of Mr. Heaton on a post-Effective Date basis.

Clover DHDA owns approximately 48.6 acres of raw land near Cloverdale, CA with a proposed development plan for approximately 229 single-family and multi-unit homes and an approximately one acre commercial parcel in a new development called "Riverdale Ranch." Total capital contributions to Clover DHDA total approximately $7.0 million, of which by Mr. Heaton or his affiliates contributed approximately $2.0 million to date. The project is currently unentitled and seeking development approvals from the City of Cloverdale and other agencies. There is approximately $5.9 million in seller financing secured by the land outstanding against Clover DHDA, which the Debtors believe exceeds the value of the property in its present and unentitled state. Clover DHDA currently has cash totaling approximately $113,067 and will require additional financing up to approximately $175,000 in order to complete the entitlement process. The Debtors believe that the other owners of Clover DHDA (including one of the members of the Creditors' Committee, John Barella) will advance sufficient funds to complete this process provided that they are given priority distribution rights to recover such advances.

Mr. Heaton is currently the manager of Clover DHDA. Mr. Heaton's strategy for creating value for this project is to obtain a tentative subdivision map for the project and then to sell the

approved project to a large production homebuilder. This builder would be responsible for obtaining the final subdivision map, installing site improvements, building homes and marketing them to homebuyers. Specifically, in order to maximize the value of the "Riverdale Ranch" project owned by Clover DHDA, Mr. Heaton will be responsible for accomplishing the following key tasks:

    a. Handling the financial affairs of Clover DHDA, including payment of land deposits on sellers' options and financing notes.

    b. Coordinating the retention, supervision, and payment of consultants with respect to Clover DHDA, such as land planning, engineering, architectural, legal, traffic, and environmental professionals.

    c. Addressing entitlement issues with the City of Cloverdale with respect to Clover DHDA, including the following:

        i. July – August 2010: preparing submissions for Tentative Map and accompanying documents regarding the Riverdale project

        ii. Providing input on Final Environmental Impact Report and new General Plan

        iii. July 2010 – August 2011: navigating Tentative Map and Environmental Impact Report through Planning Commission and City Council approval process, as follows:

            1. The subject property is located outside Cloverdale city limits, however it is within the City's sphere of influence under the draft 2025 General Plan. The existing Land Use Designation is Medium Density Residential (8 dwelling units per acre). In order to develop the property as proposed under the Vesting Tentative Map, the Riverdale Ranch project would require the following approvals:

                a. General Plan Amendment: Re-designate the proposed 1.09-acre retail/commercial site (Lot 230) of the project from Residential to General Commercial, and the proposed 4.88-acre park site (Parcel C) from Residential Use to Public Park.

                b. Pre-zoning: Pre-zone both the market value homes and the affordable duets to Planned Unit District (PUD), the 1.09-acre site (Lot 230) to General Commercial, and the 4.88-acre park site (Parcel C) to Public Park.

                c. Vesting Tentative Map and Preliminary Development Plan: Approval of the subdivision of the Riverdale Ranch project into 195 single family lots, 34 duplex lots, a 1.09-acre commercial/retail site, and a 4.88-acre public park.

        iv. Meeting with project neighbors and negotiate any neighbor issues regarding approvals of project, including traffic, noise, new sewer and water, landscaping, parks, and trail system along river.

        v. July 2010 – July 2011: Annexation: Obtaining approval of the Sonoma County Local Agency Formation Commission ("LAFCO") for the entire 48.6-

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

acre site and the Sonoma County's portion of the Cloverdale Riverdale Park to become part of the City of Cloverdale. This process will include LAFCO application, review process, hearings, and approval. Mr. Heaton will attend public hearings, work with County staff and consultants during this time to ensure City and County approvals for annexation.

vi. Other government agencies: July 2010 – July 2011: Obtaining Army Corp of Engineers-401-Permit for direct storm water discharge outfall from the proposed project into the Russian River.

vii. Working with architect, design consultants, and structural engineer to finalize house design, construction drawings, and applicable building standards.

viii. Coordinating creation of Assessment District to finance construction costs for new sewer line and park & trail system.

ix. Handling proformas, marketing packages for third party sales program, and negotiations to sell entitled Tentative Map lots to investors or private/public builders. The estimated schedule is for approx. 18 months; January 2010 through July 2011, but could take two to three years.

In summary, at the successful completion of the above events, Riverdale Ranch will be positioned for an economic and market recovery that could occur in 2012 through 2016. Riverdale Ranch will be one of only a select group of entitled projects in northern Sonoma County due to stringent growth control restrictions that exist in Cloverdale and nearby cities such as Santa Rosa, Windsor, and Healdsburg.

Throughout the entitlement process, Mr. Heaton will actively pursue opportunities to liquidate Clover DHDA's assets for a reasonable recovery or, alternatively, to joint venture with a third party who is willing to reimburse the Debtors and their partners in Clover DHDA for some of the capital invested to date.

As mentioned above, the Debtors believe that their interests in Clover DHDA could yield approximately $3.1 million in value for the estate in two to three years' time given the right circumstances in the housing market and the successful completion of the entitlement approval process pursuant to the current proposed development plan. A land residual analysis has been performed in order to obtain this estimate of future value. This analysis starts with an assumption of the projected average sales prices for the homes when they come to market. All of the projected costs for the project (including the homebuilder's required return/net profit margin) are deducted

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

from the projected sales price to reach a residual land value that equals what a builder could pay for the land to meet its required return, assuming the current projected costs for the project.

The land residual analysis for the Riverdale Ranch project is based on the following key assumptions:

- the property is sold with an approved tentative subdivision map to a homebuilder
- total land sale price is $20,300,000 (average paper lot price = $72,052 plus reimbursement to the LLC of its pre-development and remediation costs incurred prior to sale)
- market prices reset to 80% of home values in 2006-2007
- number of market-rate homes approved for the project:       229
- Projected average sales price homes in the project:       $475,443
- Average size of the new homes:       2,076 sq ft
- Development and Construction costs:       industry-standard
- Home sales prices and construction costs are not adjusted for future inflation and there is no adjustment made to the future cash flows for the time value of money
- Builder net profit margin:       12.0% of sales

Based on the foregoing assumptions, the net proceeds to Clover DHDA from the sale of the land are projected to equal $11,565,350. These proceeds will be distributed to the members in accordance with the priorities contained in Clover DHDA's operating agreement. Mr. Heaton's share of these proceeds, after repayment of a note in favor of Wells Fargo Bank is projected to be $3,147,307 under this residual analysis.

### c.   Other Development Entities

With respect to the remaining Development Entities (other than Oak Brook and Clover DHDA), additional information is provided in **Exhibit B** hereto. As noted above, the Debtors do not believe that they have any positive equity interests in these entities and the Debtors' primary task under the Plan will be to minimize deficiency claims that may be asserted on account of guarantees with respect to such Development Entities. The Debtors believe that they have the knowledge and expertise to effectuate a liquidation of the assets of the Development Entities in a manner that will result in a substantially greater return to the creditors of these entities than what otherwise would be possible without the Debtors' involvement and could result in an impairment of value equivalent to 25%. With the Debtors' assistance, the Debtors believe that they can realize approximately $55 million on account of the assets of the Development Entities. In the context of a chapter 7

liquidation or a bank-owned sale, the Debtors believe that recoveries will be reduced to approximately $40 million. A summary of the Debtors' projections are set forth in Exhibit A hereto.

Although not a Development Entity, Delco Builders was formerly the operator of the Debtors' homebuilding business. Delco Builders has no active projects and no loans outstanding, but it has ownership interests in the following entities: 10% of Cherry Lane Associates, LLC, 10% of Petaluma Ventures, LLC and 5% of Sonoma–Napa Partners, LLC. The Debtors' interests in Delco Builders will be treated as Estate Assets under the Plan.

**3.** **Debtors' Interests in Rental Properties and Vacant Lot**

The Debtors have 28 residential Rental Properties that are secured by various first and second deeds of trust and one vacant lot in Walnut Creek. The Debtors do not believe that there is any equity in these properties from the perspective of the estate, given the highly leveraged nature of these properties and anticipated sale prices in today's market, particularly after taking into account broker commissions and sales charges. Hence, the Debtors intend to sell the Rental Properties and the Walnut Creek Vacant Lot for the benefit of the secured lenders (including second lien lenders) thereon, provided that such lenders fund any holdings costs associated with these properties during the course of a marketing process and advance any amounts necessary to maintain and renovate these properties for purposes of sale on a non-recourse basis as to the Debtors. (As set forth in Section IV.B below, the Debtors also have an interest in a vacant lot in Truckee, California held through Heaton Enterprises III, LLC, which is owned by the Doyle D. Heaton Qualified Personal Residence Trust Truckee. This lot is also overleveraged and will be surrendered to the lender.)

**4.** **Debtor Retained Assets**

The Debtors have claimed various exemptions in their Schedules, including miscellaneous furnishings and personal effects, two vehicles, the Debtors' homestead exemption valued at approximately $63,000, and the Debtors' interests in social security, retirement and pension benefits.

Specifically, the Debtors have claimed the following assets as exempt pursuant to applicable provisions of the California Code of Civil Procedure ("CCP"):

(1)     Motor vehicles -  $2,550 (CCP section 704.010);

(2)     Miscellaneous furnishings –$62,000 (CCP section 704.020);

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  (3)  Miscellaneous jewelry - $5,000 (CCP section 704.040);

2  (4)  Tools of the trade - $13,475 (CCP section 704.060);

3  (5)  Social security benefits (all future benefits) – unlimited (CCP section

4 704.080);

5  (6)  Cigna whole life insurance policy held under the Delco Builders profit

6 sharing plan – $139,732.94 (CCP section 704.100);

7  (7)  Lincoln Financial Survivorship life insurance policies (held by the

8 Doyle D. Heaton and Mary K. Heaton Irrevocable Trust Dated May 28, 1991) – $1,103,927.38 (CCP

9 section 704.100 and CCP section 704.115);

10  (8)  Delco Builders profit sharing plan - $1,822,585.50 (CCP section

11 704.115);

12  (9)  Wachovia Wells Fargo Investments IRA - $75,911.97 - (CCP section

13 704.115);

14  (10)  Northrim Bank Roth IRA - $6,000 (CCP section 704.115); and

15  (11)  Homestead (Walnut Creek Property held indirectly by the Doyle D.

16 Heaton Qualified Personal Residence Trust Walnut Creek and the Mary K. Heaton Qualified

17 Personal Residence Trust Walnut Creek) - $63,000 (CCP section 704.730).

18   The Debtors currently collect approximately $3,400 per month in social security payments,

19 which they claim as exempt.

20   Under the Plan, the Debtors shall retain their exempt assets as they are entitled to do under

21 applicable law.  In addition, in consideration of the Debtors' continued work and commitment to

22 maximizing the value of the Estate Assets and minimizing claims that may be asserted against the

23 Estate, the Debtors propose to retain the Debtor Retained Assets under the Plan.[2]

24

25 [2] The Debtor Retained Assets consist of the following assets:  (a) the Walnut Creek Property (held through the Doyle D.
Heaton Qualified Personal Residence Trust Walnut Creek and the Mary K. Heaton Qualified Personal Residence Trust

26 Walnut Creek); (b) the Truckee Property (held through the Doyle D. Heaton Qualified Personal Residence Trust
Truckee); (c) the Debtors' rights and interests in SCG Builders, Inc.; (d) the Debtors' rights and interests in DRG

27 Builders, Inc.; (e) the Debtors' rights and interests in a Class B, California Contractor's License No. 386387; (f) the
Debtors' rights and interests in the Doyle D. Heaton and Mary K. Heaton Irrevocable Trust dated May 28, 1991; (g) the

28 sum of $55,000 in Cash previously held in the Doyle D. Heaton Alaska Trust; and (h) all retirement and pension benefits
and household goods, vehicles, jewelry, artwork, clothing, and other personal items of the Debtors or the Estate,

Case: 10-40297 Doc# 103 Filed: 03/24/10 Entered: 03/24/10 18:28:18 Page 29 of
68

36604-002\DOCS_SF:69786.3      DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

The Debtor Retained Assets include the Debtors' 45% ownership interest in DRG and 100% ownership interest in SCG. DRG is the operator of Mr. Heaton's homebuilding business and SCG is the general contracting entity. DRG and SCG are currently involved in five active development projects owned by the following Development Entities: Mardel, LLC; Sonoma-Napa Partners, LLC; HWR, LLC and Southgate Partners, LLC. DRG and SCG have no material outstanding debt. The Debtors require continued access and control to DRG and SCG in order to manage the disposition of the assets of the Development Entities. SCG has a 0.96785% membership interest in Walden Park Associates, LLC and a 2% membership interest in Adobe Partners, LLC and there is no equity value in such membership interests.

**B. ESTATE LIABILITIES**

As mentioned, the Debtors have scheduled nearly $120 million of unsecured debt, though this amount has been materially reduced as a result of the Wells Fargo Settlement Agreement. The bulk of the remaining claims constitute guarantee obligations that will be offset in large part by recoveries realized by the Development Entities. With the Debtors' continued involvement in the liquidation process, the Debtors believe that unsecured claims ultimately can be reduced to less than $12 million. The Debtors' projections for recoveries by creditors under the Plan are set in Exhibit A hereto.

Encompassed within these projections are significantly higher recoveries by secured creditors on account of the Rental Properties than can be expected in the context of a chapter 7 case. The Debtors estimate that their second lien lenders in particular will recover nearly 62% of their claims under the Plan through the Debtors' continued efforts as opposed to 23% in a chapter 7 case. Under either scenario, there is ample cash to pay priority claims estimated to total approximately $66,000 and administrative claims that could total $300,000, but could be significantly higher in the event of litigation or delays associated with confirming the Plan or resolving this case.

///

including all property claimed as exempt in the Schedules and the Debtors' interests in a boat and trailer listed in the Schedules.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# IV.

## RESOLUTIONS INCORPORATED IN THE PLAN

**A.** **WELLS FARGO**

The Plan incorporates and implements the Wells Fargo Settlement Agreement, previously approved by the Bankruptcy Court. As a result of this agreement, the pool of unsecured claims against the Debtors' estate has been substantially reduced.

**B.** **DEBTOR TRUSTS**

As of October 1, 2009, the Debtors had the following seven self-settled trusts in place: (a) the Doyle D. Heaton and Mary K. Heaton Irrevocable Trust Dated May 28, 1991; (b) the Heaton Family Revocable Trust dated February 6, 1986; (c) the Doyle D. Heaton Alaska Trust dated September 24, 2008; (d) the Mary K. Heaton Alaska Trust dated September 24, 2008; (e) Doyle D. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008; (f) Mary K. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008; and (g) the Doyle D. Heaton Qualified Personal Residence Trust Truckee dated September 24, 2008.

By direction letters dated October 23, 2009, the Debtors terminated the Doyle D. Heaton Alaska Trust dated September 24, 2008 and the Mary K. Heaton Alaska Trust dated September 24, 2008. The Debtors decided to terminate such trusts, and obtained approval of the independent trustees of such trusts to do so, in order to have adequate funds available to the Debtors to pay creditors in the event that the Debtors were able to effectuate a restructuring plan outside of bankruptcy. This proved to be impossible as the Debtors were forced to commence this case in January 2010.

The assets of the Doyle D. Heaton Alaska Trust consisted of approximately $601,100 held in Federated U.S. Treasury Cash Reserves Fund #125 ($420,534.19), Northrim Principal Money Market Account ($171,973.35), Northrim Income Money Market Fund ($8,591.03) and interests in 133 Parks, LLC (which held a parcel of vacant land in Alaska worth approximately $50,000).

The assets of the Mary K. Heaton Alaska Trust contained cash in the amount of approximately $239,764.95 held in Federated U.S. Treasury Cash Reserves Fund #125 ($60,000.02),

Northrim Principal Money Market Account ($178,618.60) and Northrim Income Money Market Fund ($1,145.53).

The assets of the Doyle D. Heaton Alaska Trust and the Mary K. Heaton Alaska Trust are now part of the Estate; however, as part of the consideration payable to the Debtors under the Plan, the Debtors will be retaining the sum of $55,000 in cash out of the funds previously held through the Doyle D. Heaton Alaska Trust.

The assets of the Debtors' remaining trusts as of the Petition Date are described further below:

(1) <u>The Doyle D. Heaton and Mary K. Heaton Irrevocable Trust Dated May 28, 1991</u>. This trust contains three survivorship life insurance policies, with net cash surrender values of $231,941.57, $548,967.87 and $323,017.94, for a total net cash surrender value of $1,103,927.38.

(2) <u>The Heaton Family Revocable Trust dated February 6, 1986</u>. This trust contains cash in the amount of approximately $28,200 held at U.S. Bank.

(3) and (4) <u>The Doyle D. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008 and the Mary K. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008</u>. The Debtors' homestead, the Walnut Creek Property located at 2960 Cherry Lane, Walnut Creek, California, is currently held in the name of: (a) Heaton Enterprises I, LLC, which is wholly owned by the Doyle D. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008, and (b) Heaton Enterprises II, LLC, which is wholly owned by the Mary K. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008. The Walnut Creek Property has an estimated fair market value of $850,000 and a first trust deed held by Heritage Bank in the amount of approximately $787,000. Heritage Bank also has the benefit of a second deed of trust against this property.

(7) <u>The Doyle D. Heaton Qualified Personal Residence Trust Truckee dated September 24, 2008</u>. The Debtors' 55% interest in the Truckee Property, a single family home located at 12916 Falcon Point Place, Truckee, California, is currently held in the name of Heaton Enterprises III, LLC, which is wholly owned by the Doyle D. Heaton Qualified Personal Residence Trust Truckee dated September 24, 2008. The Truckee Property has an estimated fair market value of $800,000

and a first trust deed held by Bank of America in the amount of approximately $271,519. Heaton Enterprises, III is also the owner of 100% of the interests in a vacant lot located at 12972 Muhlbach Way, Truckee, CA. This property has an estimated fair market value of $250,000 and a first trust deed held by Anthony and Angela Bilich in the amount of approximately $239,489. The Debtors do not believe that there is an equity value in this vacant lot and intend to surrender the property to the lender.

It is the Debtors' position that property held by the foregoing trusts (excluding the Doyle D. Heaton Alaska Trust and the Mary K. Heaton Alaska Trust) does not constitute property of the Debtors' Estate. However, all assets of such trusts have been disclosed for informational purposes.

For purposes of the Plan, the term "Debtor Trusts" refers only to the Doyle D. Heaton Alaska Trust, the Mary K. Heaton Alaska Trust, and the Heaton Family Revocable Trust dated February 6, 1986. The Debtor Trusts do not include the Doyle D. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008, the Doyle D. Heaton Qualified Personal Residence Trust Truckee dated September 24, 2008, and the Mary K. Heaton Qualified Personal Residence Trust Walnut Creek dated November, 2008.

Under the Plan, the assets of the Debtor Trusts constitute property of the Estate, excluding only the Debtor Retained Assets. The sum of $55,000 previously held in the Doyle D. Heaton Alaska Trust and the assets in the non-Debtor Trusts listed above are Debtor Retained Assets that will not be available for distribution to Creditors.

## C.  **BANK OF MARIN/HERITAGE BANK**

Although not formally structured as settlements, the Plan contemplates certain arrangements with Bank of Marin and Heritage Bank pursuant to which the Debtors will retain, market and sell the real property collateral securing the Debtors' obligations to these creditors for the benefit of such creditors, provided that each such creditor finances the sale effort. In exchange, the Debtors' liability on account of any deficiency claims relating to such real property collateral will be minimized.

In the case of Bank of Marin, the Debtors will dispose of a vacant lot located at 2962 Cherry Lane adjacent to their homestead in Walnut Creek (the "Walnut Creek Vacant Lot"). Prior to the

DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Petition Date, the Debtors effectuated a Lot Line Adjustment to the Walnut Creek Vacant Lot that resulted in an approximately 8,000 square foot addition to the Debtors' Walnut Creek Property, which the Debtors claim as exempt and will be treated as a Debtor Retained Asset under the Plan. The Debtors have agreed to compensate Bank of Marin for such Lot Line Adjustment in the amount of $55,000. The funds to make this payment will come out of the cash previously held in the Doyle D. Heaton Alaska Trust and will be retained by the Debtors for their own benefit. These funds are part of the consideration to which the Debtors are entitled under the Plan as consideration for their ongoing cooperation and involvement in the liquidation of the Estate Assets for the benefit of creditors. Further, Bank of Marin shall retain its existing liens against the Debtors' interests in two Development Entities: Corona Road Associates, LLC and Adobe Partners, LLC. The Debtors do not expect to realize any value out of these ownership interests. Bank of Marin shall have no unsecured deficiency claim against the Estate relating to the Walnut Creek Vacant Lot, but will retain whatever other unsecured claims Bank of Marin may have independent of the Walnut Creek Vacant Lot, which claims will be treated in Class 7 under the Plan.

With respect to Heritage Bank, the Plan provides that the Debtors will market the Rental Properties in which Heritage Bank has a second deed of trust in an effort to maximize recoveries by this creditor. The Debtors also propose to abandon interest reserve accounts held by Heritage Bank, to the extent not already abandoned, with respect to the Rental Properties in the amount of approximately $72,217. Consistent with its deeds of trust, Heritage Bank will also be entitled to any rental proceeds available to the Debtors from the Rental Properties in which Heritage Bank has a security interest and assignment of rents (after payment of any applicable maintenance expenses, taxes, and first lien lender claims). Upon completion of the Debtors' sale effort with respect to such Rental Properties, Heritage Bank will release its second deed of trust against the Walnut Creek Property, which will then yield the Debtors an equity cushion in such property in the amount of $63,000. The Debtors have already claimed this equity in their homestead as exempt. Heritage Bank will retain its first lien against the Walnut Creek Property, which will be reinstated and will remain an obligation of the Debtors following the Effective Date, except that the maturity date as to such loan shall be extended by three years on an interest-only basis.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# V.

## DESCRIPTION OF PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows constitutes a summary only. You are urged to read the Plan in full in evaluating whether to accept or reject the Plan.

**A.    CLASSIFICATION OF CLAIMS AND INTERESTS**

The Plan divides Creditors into Classes. Creditors with similar Claims are placed in the same Class. There are seven (7) Classes of Claims and one (1) Class of Interests under the Plan as follows:

1.    **Class 1 Claims (Priority Non-Tax Claims).**

Class 1 consists of Allowed Priority Employee Claims.

2.    **Class 2 Claims (Secured Claims Against Truckee Property)**

Class 2 consists of the Secured Claims against the Truckee Property.

3.    **Class 3 Claims (Bank of Marin Secured Claims)**

Class 3 consists of the Bank of Marin Secured Claims.

4.    **Class 4 Claims (Heritage Bank Secured Claims)**

Class 4 consists of the Heritage Bank Secured Claims.

5.    **Class 5 Claims (Miscellaneous Secured Claims).**

Class 5 consists of Allowed Miscellaneous Secured Claims.

6.    **Class 6 Claims (Wells Fargo Claims).**

Class 6 consists of the Wells Fargo Claims.

7.    **Class 7 Claims (General Unsecured Claims).**

Class 7 consists of the General Unsecured Claims.

8.    **Class 8 Interests.**

Class 8 consists of the Debtors' Interests.

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B.      TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS**

The treatment of Claims and Interests classified under the Plan is as follows:

**1.      Class 1 (Priority Non-Tax Claims)**

Class 1 Claims are unimpaired.  Each holder of an Allowed Priority Non-Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, receive from the Debtors, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Priority Non-Tax Claim, a Cash payment in an amount equal to the difference between: (a) such Allowed Non-Tax Claim, and (b) the amount of any Permitted Payments made to the holder of such Claim, on the latest of: (i) the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Debtors may agree.

**2.      Class 2 (Secured Claims Against Truckee Property)**

Class 2 Claims are unimpaired.  From and after the Effective Date, all rights of the holders of Allowed Secured Claims Against Truckee Property shall be unimpaired in accordance with Section 1124(2) of the Bankruptcy Code.  As soon as practicable following the Effective Date, the Debtors shall cure any and all defaults with respect to the Allowed Secured Claims Against Truckee Property and compensate the holders of such Claims for any damages with respect thereto to the extent and in the manner required by Section 1124(2) of the Bankruptcy Code.  Unless otherwise agreed by the Debtors and the holders of the Allowed Secured Claims Against Truckee Property, the maturity and terms of such Claims shall be reinstated on the Effective Date pursuant to Section 1124(2) of the Bankruptcy Code and shall be obligations of the Debtors from and after the Effective Date.  The Debtors shall be permitted to retain ownership and control of the Truckee Property as a Debtor Retained Asset from and after the Effective Date, subject to the Allowed Secured Claims Against Truckee Property.

**3.      Class 3 (Bank of Marin Secured Claims)**

Class 3 Claims are impaired.  On or as soon as practicable following the Effective Date, in full and final satisfaction and release of the Allowed Bank of Marin Secured Claims:  (a) the Debtors

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

shall retain their interests in the Walnut Creek Vacant Lot, subject to the Lot Line Adjustment and any existing Liens (including the Bank of Marin Secured Claims), solely for the purpose of liquidating such asset and distributing the proceeds thereof to the holders of any Liens thereon; (b) Bank of Marin's Liens against the Walnut Creek Vacant Lot shall be deemed to be modified consistent with the Lot Line Adjustment and such Liens shall be released as to the real property covered by the Lot Line Adjustment; (c) the Debtors shall pay the sum of $55,000 to the holder of the Bank of Marin Secured Claims out of the Debtor Retained Assets on account of the Lot Line Adjustment and such payment shall be made no later than seven (7) days following the Effective Date; (d) the holder of the Bank of Marin Secured Claims shall retain any and all Liens and Claims against any Person other than the Debtors; and (e) the holder of the Bank of Marin Secured Claims shall retain its Liens against the Debtors' interests in Corona Road Associates, LLC and Adobe Partners, LLC, such that the Debtors will pay to the holder of the Bank of Marin Secured Claims the proceeds of any distributions out of these entities that become available to the Debtors. For the avoidance of doubt, Bank of Marin shall retain its Liens and Claims against the Walnut Creek Vacant Lot to the same extent, validity and priority as such Liens existed as of the Petition Date, but such Liens and Claims in favor of Bank of Marin shall be non-recourse as to the Debtors and the Estate. Bank of Marin shall not be entitled to any Unsecured Deficiency Claim with respect to the Walnut Creek Vacant Lot against the Debtors or the Estate, but shall retain any other available General Unsecured Claims against the Estate, which shall be treated in Class 7 under the Plan.

**4.**     **Class 4 (Heritage Bank Secured Claims)**

Class 4 Claims are impaired. On or as soon as practicable following the Effective Date, in full and final satisfaction and release of the Allowed Heritage Bank Secured Claims:  (a) the Debtors shall retain their interests in the real property and improvements collateralizing the Heritage Bank Secured Claims, subject to any existing Liens (including the Heritage Bank Secured Claims), solely for the purpose of liquidating such assets (excluding the Walnut Creek Property) and distributing the proceeds thereof to the holders of any Liens thereon; (b) the Debtors shall cure any and all defaults with respect to the Heritage Secured Claims comprised solely of the first priority Lien against the Walnut Creek Property and the terms of such Claims shall be reinstated and shall be obligations of

the Debtors from and after the Effective Date (except that the maturity date of such Claims shall be extended for a period of three years beyond their existing maturity date on an interest-only basis); (c) the Debtors shall abandon their interests in the Heritage Bank Interest Reserve to Heritage Bank, to the extent not already abandoned, and such reserve shall be applied to reduce the Heritage Bank Secured Claims; (d) the Debtors shall abandon, and agree to turnover, to Heritage Bank (after payment of any applicable maintenance expenses, taxes, and first lien lender claims) any rental proceeds in the Debtors' custody, possession or control received for the period from and after the Petition Date on account of the assets collateralizing the Heritage Bank Secured Claims and such proceeds shall be applied to reduce the Heritage Bank Secured Claims; (e) Heritage Bank shall be entitled to an Unsecured Deficiency Claim against the Estate which shall be treated as an Allowed General Unsecured Claim in Class 7 in an amount equal to the lesser of (i) $400,000, and (ii) the amount, if any, of Heritage Bank's actual deficiency claim after the Debtors complete the liquidation of the properties collateralizing the Heritage Bank Secured Claims (excluding the Walnut Creek Property); (f) except as set forth in clauses (a)-(e) hereof, the Debtors shall have no further obligations on account of the Heritage Bank Secured Claims; and (e) upon completion of the Debtors' obligations contemplated in clauses (a), (c) and (d) above, Heritage Bank shall release its second priority Lien against the Walnut Creek Property. For the avoidance of doubt, Heritage Bank shall retain its Liens and Claims against the Debtors' real property and improvements to the same extent, validity and priority as such Liens existed as of the Petition Date, but all such Liens and Claims in favor of Heritage Bank shall be non-recourse as to the Debtors and the Estate (except as to Heritage Bank's the first priority Lien against the Walnut Creek Property). The Debtors shall be permitted to retain ownership and control of the Walnut Creek Property as a Debtor Retained Asset from and after the Effective Date, subject to the Heritage Bank Secured Claims as set forth above.

**5.  Class 5 (Miscellaneous Secured Claims)**

Class 5 Claims are impaired. On or as soon as practicable following the Effective Date, the Debtors shall select, in his or her discretion, one of the following alternative treatments for each Allowed Miscellaneous Secured Claim in Class 5, which treatment shall be in full and final

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Miscellaneous Secured Claim:

> a. *Abandonment or Surrender*. The Debtors will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim.

> b. *Cash Payment*. The Debtors will pay to the holder of such Claim Cash equal to the amount of such Claim, or such lesser amount to which the holder of such Claim and the Debtors shall agree, in full satisfaction and release of such Claim.

> c. *Unimpairment*. The Debtors will leave the rights of the holder of such Claim unimpaired or provide for such other treatment as necessary to otherwise satisfy the requirements of the Bankruptcy Code.

Any Unsecured Deficiency Claim asserted by a holder of an Allowed Miscellaneous Secured Claim in Class 5 shall be filed with the Bankruptcy Court within thirty (30) days following the date of the abandonment or surrender of such Creditor's collateral or such Creditor's receipt of its distribution under the Plan. Any such Allowed Unsecured Deficiency Claim shall be treated as a General Unsecured Claim in Class 7.

**6.    Class 6 (Wells Fargo Claims)**

Class 6 Claims are impaired. On or as soon as practicable following the Effective Date, the holder of Allowed Wells Fargo Claims shall receive, in full and final satisfaction, settlement, release, and discharge of, and exchange for, such Allowed Wells Fargo Claims, the rights and benefits set forth in the Wells Fargo Settlement Agreement.

In addition to the foregoing treatment, on or as soon as practicable following the Effective Date, (a) subject to Wells Fargo's rights under the Wells Fargo Settlement Agreement, the Debtors shall retain their interests in the real property and improvements collateralizing certain of the Wells Fargo Claims (as identified in schedule 2 to the Wells Fargo Settlement Agreement), subject to any existing Liens (including the Wells Fargo Claims), solely for the purpose of liquidating such assets and distributing the proceeds thereof to the holders of any Liens thereon, all without compensation to the Debtors or the Estate; (b) the Debtors shall abandon, and agree to turnover, to Wells Fargo

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

(after payment of any applicable maintenance expenses, taxes, and first lien lender claims) any rental proceeds in the Debtors' custody, possession or control received for the period from and after the Petition Date on account of the assets collateralizing the Wells Fargo Claims; and (c) except as set forth above, the Debtors and the Estate shall have no further obligations on account of the Wells Fargo Claims. For the avoidance of doubt, Wells Fargo shall not be entitled to any Unsecured Deficiency Claim on account of the Wells Fargo Claims against the Debtors or the Estate. Wells Fargo shall retain its Liens and Claims against certain of the Development Entities to the same extent, validity and priority that such Liens and Claims existed as of the Petition Date and, as set forth in clauses (a) and (b) above, Wells Fargo shall retain its Liens against the Debtors' real property and improvements, but all such Liens and Claims in favor of Wells Fargo shall be non-recourse as to the Debtors.

**7.    Class 7 (General Unsecured Claims)**

Class 7 Claims are impaired. On or as soon as practicable following the Effective Date, each holder of an Allowed General Unsecured Claim shall receive a Pro Rata share of the Net Proceeds of the Estate Assets that remain available after taking into account the treatment of Claims in Classes 1-6 above. Such distribution shall be in full and final satisfaction, settlement, release, and discharge of, and exchange for, all Allowed General Unsecured Claims held by such holder.

**8.    Class 8 (Interests)**

Class 8 Interests are impaired. From and after the Effective Date, in accordance with Section 1129(b)(2)(B)(ii) of the Bankruptcy Code, the Debtors shall retain the Debtor Retained Assets and the right to earn fees and compensation as set forth in the Plan. Any income earned by the Debtors from and after the Effective Date unrelated to the Estate Assets or to the extent permitted in the Plan shall be excluded from distributions to Creditors under the Plan.

**C.    TREATMENT OF UNCLASSIFIED CLAIMS**

Certain Claims against the Debtors are not classified for purposes of voting on, or receiving distributions under, the Plan. The treatment of unclassified Claims under the Plan is as follows:

36604-002\DOCS_SF:69980.3    DISCLOSURE STATEMENT IN SUPPORT OF JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1. **Administrative Claims.**

Each Allowed Administrative Claim (except for Professional Fees, which shall be treated as set forth in Section V.C.3 below) shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Debtors on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; (d) such date as the holder of such Claim and the Debtors may agree; and (e) the date such Claim is otherwise due according to its terms.  All requests for payment of Administrative Claims (except with respect to Professional Fees, which instead shall be subject to the Professional Fees Bar Date) must be filed by the Administrative Claim Bar Date or the holders thereof shall be forever barred from asserting such Administrative Claims against the Debtors and the Estate and/or from sharing in any distribution under the Plan.

2. **Priority Tax Claims.**

Each Allowed Priority Tax Claim shall, unless the holder of such Claim shall have agreed to different treatment of such Claim, be paid in full in Cash by the Debtors on the latest of: (a) the Effective Date, or as soon thereafter as practicable; (b) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (c) the fourteenth day after such Claim is Allowed, or as soon thereafter as practicable; (d) such date as the holder of such Claim and the Debtors may agree; and (e) the date such Claim is otherwise due according to its terms.

3. **Claims for Professional Fees.**

Each Professional seeking an award by the Bankruptcy Court of Professional Fees: (a) must file its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date on or before the Professional Fees Bar Date; and (b) if the Bankruptcy Court grants such an award, each such Person will be paid in full in Cash by the Debtors as to Allowed Professional Fees against the Estate in such amounts as are allowed by the Bankruptcy Court as soon as practicable following the first day after such order has been entered by the Bankruptcy Court and is not stayed.  All final applications for allowance and disbursement

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

of Professional Fees must be in compliance with all of the terms and provisions of any applicable order of the Bankruptcy Court, including the Confirmation Order.

**VI.**

**IMPLEMENTATION OF THE PLAN**

The Plan shall be implemented on the Effective Date. In addition to the provisions set forth elsewhere in the Plan regarding means of execution, the following shall constitute the principal means for the implementation of the Plan.

**A.      REVESTING AND LIQUIDATION OF ESTATE ASSETS**

On the Effective Date and subject to the provisions of the Plan and the oversight of the Plan Representative, the Debtors shall be vested with all right, title and interest in the Estate Assets for the benefit of Creditors, free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as set forth in the Plan. The Debtors will effectuate an orderly liquidation of the Estate Assets for the benefit of Creditors in accordance with the Plan and subject to the oversight of the Plan Representative. The Debtors shall segregate the Estate Assets separate from the Debtor Retained Assets and shall not commingle the Estate Assets with the Debtors' personal assets.

**B.      REVESTING OF DEBTOR RETAINED ASSETS**

On the Effective Date and subject to the provisions of the Plan, the Debtors shall be vested (for their own personal benefit) with the Debtor Retained Assets free and clear of all Claims, Liens, charges, other encumbrances and Interests, except as set forth in the Plan.

**C.      ROLE OF PLAN REPRESENTATIVE**

From and after the Effective Date, the Plan Representative shall monitor the status and progress of the Debtors' efforts to effectuate the terms of the Plan. The Plan Representative shall meet and consult periodically with the Debtors and keep himself or herself apprised of the Debtors' affairs as they relate to the Estate Assets and the objectives of the Plan. The Debtors shall be obligated to provide full and complete access and disclosure to the Plan Representative to monitor the Debtors' activities under the Plan and to ensure that the Debtors comply with the terms of the Plan. To the extent contemplated by the Plan, the Debtors shall be required to consult with the Plan Representative, and to obtain input from the Plan Representative, reasonably in advance

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

of taking action under the Plan. The Plan Representative shall have standing to petition the Bankruptcy Court for relief to the extent that the Debtors fail to provide information to the Plan Representative or to otherwise comply with the terms of the Plan. The Plan Representative shall respond to Creditor inquiries, but shall not be required to prepare formal or regular reports to Creditors. The Plan Representative shall have no fiduciary duties to Creditors. The Plan Representative's role shall be limited to the rights and obligations set forth in the Plan and the Plan Representative shall be entitled to any and all immunities otherwise available to representatives or trustees appointed by the Bankruptcy Court. The Plan Representative shall not be bonded or required to carry insurance with respect to the Chapter 11 Case. The identity of the initial Plan Representative shall be disclosed in a filing with the Bankruptcy Court at least seven (7) days prior to the deadline for objections to confirmation of the Plan. In the event that the Plan Representative dies or otherwise becomes permanently disabled, the Debtors may request that the Bankruptcy Court appoint a successor. If the Plan Representative wishes to resign, he or she must petition the Bankruptcy Court to appoint a successor. The Plan Representative shall be compensated from the Estate Assets for services rendered in the Chapter 11 Case at his or her customary hourly rate, plus reimbursement of expenses reasonably incurred. The Plan Representative shall not be required to file a fee application to receive compensation. The Plan Representative shall be permitted to employ counsel only to the extent necessary to petition the Bankruptcy Court as provided herein, and such counsel shall be compensated out of the Estate Assets. The Plan Representative shall not be permitted to employ any other Agents, unless otherwise ordered by the Bankruptcy Court. The role of the Plan Representative shall terminate upon distribution of substantially all Estate Assets.

**D. DEBTORS' POWERS AND AUTHORITY**

**1. Generally.**

From and after the Effective Date and subject to the oversight of the Plan Representative, the Debtors' principal objectives and responsibilities under the Plan shall be to: (a) maximize the value of the Estate Assets for the benefit of Creditors; (b) minimize Claims that may be asserted against the Debtors and the Estate; (c) reconcile Claims against the Debtors; and (d) make distributions to Creditors in accordance with the terms of the Plan. On the Effective Date and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Case: 10-40297   Doc# 103   Filed: 03/24/10   Entered: 03/24/10 16:28:16   Page 43 of 68

SF:69436.3   DOCS_SF:69436.3

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

subject to the oversight of the Plan Representative, the Debtors shall be deemed to have been appointed as the representatives of the Estate by the Bankruptcy Court pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code for purposes of the Estate Assets. The powers, authority, responsibilities and duties of the Debtors shall be governed by the Plan and the Confirmation Order. The Debtors may execute, deliver, file or record such documents, instruments, releases and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

### 2. Responsibility and Authority of Debtors.

Subject to the oversight of the Plan Representative, the responsibilities and authority of the Debtors from and after the Effective Date shall include: (a) effectuating a liquidation of the Estate Assets (including the assets of the Development Entities) in a manner that maximizes value for the benefit of Creditors and minimizes Claims that may be asserted against the Estate, including deficiencies that may exist as to Claims against the assets of the Development Entities; (b) reviewing, reconciling, and if appropriate, objecting to Claims against the Estate; (c) pursuing, collecting and retaining any Tax Refunds available to the Estate (including filing and prosecuting any necessary or appropriate motions under Section 505 of the Bankruptcy Code to determine the finality of any Tax Refunds received by the Debtors or the Estate); (d) analyzing and, if appropriate, pursuing any Available Claims and/or Defenses, in any court of competent jurisdiction; (e) calculating and implementing all distributions from the Estate Assets in accordance with the Plan; (f) retaining and paying at normal and customary rates, or on a contingency fee basis, professionals in connection with the Debtors' duties under the Plan; and (g) such other responsibilities as may be vested in the Debtors pursuant to the Plan or the Confirmation Order or as may be necessary and proper to carry out the provisions of the Plan.

### 3. Powers of Debtors.

Subject to the oversight of the Plan Representative, the powers of the Debtors to administer the Estate Assets from and after the Effective Date shall, without any need for approval of the Bankruptcy Court in each of the following instances, include *inter alia*, (a) the power to invest funds in, and withdraw, make distributions and pay taxes and other obligations owed by the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Debtors from the Estate Assets in accordance with the Plan, (b) the power to engage and compensate without prior Bankruptcy Court order or approval employees and professionals to assist the Debtors with respect to their responsibilities under the Plan, (c) the power to prosecute, compromise and settle the Available Claims and/or Defenses on behalf of the Estate, and (d) such other powers as may be vested in or assumed by the Debtors pursuant to the Plan or order of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan. Subject to the oversight of the Plan Representative, the Debtors shall have absolute discretion from and after the Effective Date to pursue or not to pursue any and all Available Claims and/or Defenses, as the Debtors determine is in the best interests of Creditors and consistent with the purposes of the Plan, and the Debtors shall have no liability for the outcome of their decision, other than those decisions constituting gross negligence or willful misconduct. The Debtors may incur any reasonable and necessary expenses in liquidating and converting the Estate Assets to Cash.

**4.      Compensation of Debtors and Professionals.**

From and after the Effective Date, the Debtors shall be compensated (for their own personal benefit) for their efforts to effectuate the provisions of the Plan in the form of a management fee out of the Estate Assets in the amount of $25,000 per month for a period of one (1) year following the Effective Date and, to the extent beneficial to the Estate and approved by the Plan Representative, up to $10,000 per month for one (1) year following the one (1) year anniversary of the Effective Date. As an additional incentive to the Debtors for implementing the Plan, the Debtors shall be compensated (for their own personal benefit) in the form of a success fee equal to 20% of any distributions realized by the Estate on account of the Debtors' interests in Clover DHDA, LLC. The Debtors shall not be required to file a fee application to receive compensation. The Debtors shall have the right to retain the services of attorneys, accountants, and other professionals and agents in the discretion of the Debtors, including those parties who acted as Professionals for the Debtors and the Estate during the Chapter 11 Case, to assist and advise the Debtors in the performance of their duties and to compensate such professionals from

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

the Estate Assets to the extent such Professionals are retained by the Debtors for purposes of effectuating the terms of the Plan for the benefit of Creditors.

**E.    LICENSE AND OVERHEAD**

From and after the Effective Date, the Debtors shall retain ownership and control of, and shall be permitted to utilize, the contractor license held by SCG and the staff and overhead available to DRG.  The Debtors shall be permitted to fund the operations of DRG out of Estate Assets in the amount of $15,000 per month for a period of one (1) year following the Effective Date solely for purposes of reimbursing DRG for services performed consistent with the objectives of the Plan in maximizing the value of Estate Assets and/or reducing Creditor deficiency claims arising out of the Development Entities.  The Debtors also shall be permitted to utilize SCG and DRG for purposes outside of the Plan provided that such use does not conflict with the terms of the Plan and no Estate Assets are used to fund SCG or DRG for such purpose.

**F.    ABANDONMENT**

From and after the Effective Date and subject to the oversight of the Plan Representative, the Debtors may, in their discretion, abandon an Estate Asset or cause a Development Entity to abandon its property to the extent that such asset or property is burdensome or of inconsequential value to the Estate, subject to the consent of any applicable lenders with liens against such property.  In addition, the Debtors may, in their discretion, permit or allow a creditor with security interests in the assets of any Development Entity to foreclose on its collateral to the extent that such assets are burdensome or of inconsequential value to the Estate, it being understood that pursuant to the Wells Fargo Settlement Agreement, the Debtors have agreed not to challenge, impede or delay any such foreclosures sought by Wells Fargo.

**G.    FINANCING**

From and after the Effective Date and subject to the oversight of the Plan Representative, the Debtors may, in their discretion, cause a Development Entity to incur credit as may be necessary to maximize recoveries available to such Development Entity.  Any excess funds remaining after payment of debts of any applicable Development Entity shall be distributed to the Debtors and made available to Creditors as Estate Assets under the Plan, except as otherwise set

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  forth in the Plan.  Notwithstanding the foregoing, the Debtors shall not personally guarantee or

2  become obligated to pay any new loans provided to or for the benefit of any Development Entity

3  from and after the Effective Date.  In addition, from and after the Effective Date and subject to the

4  oversight of the Plan Representative, the Debtors shall be permitted to obtain advances that Bank

5  of Marin, Heritage Bank and/or Wells Fargo agree to make with respect to real property and

6  improvements that the Debtors are liquidating under the Plan for the benefit of such Creditors.

7  Any advances from Bank of Marin, Heritage Bank and/or Wells Fargo shall be payable solely out

8  of the proceeds of asset sales and shall be non-recourse to the Debtors and the Estate.

9  **H.** **AVAILABLE CLAIMS AND/OR DEFENSES**

10  Unless any Available Claim and/or Defense is expressly waived, relinquished, released,

11  compromised, or settled in the Plan, the Wells Fargo Settlement Agreement, or any Final Order

12  (including, without limitation, the Confirmation Order), the Debtors expressly reserve for the

13  benefit of Creditors any Available Claims and/or Defenses for later adjudication.  The Available

14  Claims and/or Defenses specifically include, without limitation, any and all Avoidance Actions not

15  expressly waived, relinquished, released, compromised, or settled in the Plan, the Wells Fargo

16  Settlement Agreement, or any Final Order, including claims to avoid the transfers identified in the

17  Schedules, all of which are expressly preserved and may be pursued by the Debtors against such

18  parties or any subsequent transferees.  Creditors are urged to review the Schedules, which identify

19  the specific transfers, including names of transferees and dates and amounts of transfers, that may

20  be the subject of an Avoidance Action.  The reservation set forth in this section shall include,

21  without limitation, any Available Claims and/or Defenses not specifically identified in the Plan or

22  Disclosure Statement, or of which the Debtors presently may be unaware, or which may arise or

23  exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or

24  circumstances that may change or be different from those the Debtors now believe to exist and,

25  therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata,

26  collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or

27  otherwise), or laches will apply to such Available Claims and/or Defenses upon or after the

28  Confirmation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  except where such claims and/or defenses have been expressly waived, relinquished, released,

2  compromised, or settled in the Plan, the Wells Fargo Settlement Agreement, or by Final Order.

3  Following the Effective Date and subject to the oversight of the Plan Representative, the Debtors

4  (on behalf of Creditors) may assert, compromise or dispose of the Available Claims and/or

5  Defenses without further notice to Creditors or authorization of the Bankruptcy Court.

6  **I.      WELLS FARGO SETTLEMENT AGREEMENT**

7           The Plan implements and effectuates the terms of the Wells Fargo Settlement Agreement.

8  From and after the Effective Date, the Debtors shall be obligated to observe and perform any and

9  all obligations required under the Wells Fargo Settlement Agreement.

10 **J.      DEBTOR TRUSTS**

11          The Estate Assets include all assets owned by the Debtors and the Debtor Trusts, excluding

12 only the Debtor Retained Assets.  To the extent not terminated prior to the Effective Date, the

13 Debtor Trusts shall be terminated as of the Effective Date and all assets of the Debtor Trusts shall

14 revert to the Debtors and constitute Estate Assets, excluding only the Debtor Retained Assets.

15 **K.      DEATH OR INCAPACITY OF DEBTORS**

16          In the event that one or the both of the Debtors dies or otherwise becomes permanently

17 incapacitated prior to final disposition of the Estate Assets and entry of a final decree closing the

18 Chapter 11 Case, the obligations of the Debtors under the Plan shall become the responsibility

19 either of: (a) the surviving and able Debtor; or (b) a representative appointed by the Bankruptcy

20 Court upon motion by the Plan Representative or any party-in-interest on reasonable notice to all

21 Creditors.

22 **L.      DISSOLUTION OF THE CREDITORS' COMMITTEE**

23          On the Effective Date, the Creditors' Committee shall be dissolved and the members of the

24 Creditors' Committee shall be released and discharged from any further authority, duties,

25 responsibilities, liabilities and obligations related to, or arising from, the Chapter 11 Case, except

26 that the Creditors' Committee shall continue in existence and have standing and capacity to

27 prepare and prosecute applications for the payment of fees and reimbursement of expenses

28 incurred by the Creditors' Committee or its Professionals.

**M.    FINAL DECREE**

At any time following the Effective Date and subject to the approval of the Plan Representative, the Debtors shall be authorized to file a motion for the entry of a final decree closing the Chapter 11 Case pursuant to Section 350 of the Bankruptcy Code.

**VII.**

**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    REJECTION OF CONTRACTS AND LEASES**

Except for any executory contracts or unexpired leases of the Debtors:  (a) that previously were assumed or rejected by an order of the Bankruptcy Court, pursuant to Section 365 of the Bankruptcy Code; (b) as to which a motion for approval of the assumption or rejection of such contract or lease has been filed and served prior to Confirmation; or (c) that constitute contracts of insurance in favor of, or that benefit, the Debtors or the Estate, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to Section 365 of the Bankruptcy Code as of the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court approving such rejection, pursuant to Section 365 of the Bankruptcy Code, as of the Effective Date.  Any insurance policy acquired for the benefit of the Debtors before or after the Petition Date shall remain in full force and effect after the Effective Date according to its terms.

**B.    BAR DATE FOR REJECTION DAMAGES**

If the rejection of an executory contract or unexpired lease pursuant to the Plan or otherwise gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the Debtors or the Estate, unless a proof of Claim is filed with the Bankruptcy Court and served on the Debtors by the Rejection Claim Bar Date.

///

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# VIII.

## EFFECTS OF CONFIRMATION

**A.    BINDING EFFECT**

The rights afforded under the Plan and the treatment of all Claims and Interests under the Plan shall be the sole and exclusive remedy on account of such Claims against the Debtors and the Estate Assets, including any interest accrued on such Claims from and after the Petition Date or interest which would have accrued but for the commencement of the Chapter 11 Case.  The distributions made pursuant to the Plan shall be in full and final satisfaction, settlement, release and discharge of the Allowed Claims on account of which such distributions are made.  Confirmation of the Plan shall bind and govern the acts of the Debtors and all holders of Claims against the Debtors, whether or not:  (a) a proof of Claim is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (b) a Claim is allowed pursuant to Section 502 of the Bankruptcy Code, or (c) the holder of a Claim has accepted the Plan.

**B.    PROPERTY REVESTS FREE AND CLEAR**

As also set forth above in Section VI.A and in Section 5.1 of the Plan, upon the Effective Date, title to all Estate Assets of the Debtors shall vest in the Debtors for the benefit of Creditors and for the purposes contemplated under the Plan.  Except as otherwise provided in the Plan, upon the Effective Date, all Estate Assets shall be free and clear of all Claims and Interests, including Liens, charges or other encumbrances of Creditors of the Debtors.  As also set forth above in Section VI.B and in Section 5.2 of the Plan, upon the Effective Date, title to the Debtor Retained Assets shall vest in the Debtors for their own personal benefit, subject to terms of the Plan.  Except as otherwise provided in the Plan, upon the Effective Date, all Debtor Retained Assets shall be free and clear of all Claims and Interests, including Liens, charges or other encumbrances of Creditors of the Debtors.

**C.    DISCHARGE**

*Upon the Effective Date and except as provided in the Plan or the Confirmation Order, (a) the rights afforded under the Plan and the treatment of Claims under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims, including, without limitation,*

36004-002\DOCS_SF:69780.3                    DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

*any interest or fees accrued on the Wells Fargo Claims and/or General Unsecured Claims from*

*the Petition Date; and (b) confirmation of the Plan shall discharge the Debtors from all Claims or*

*other debts that arose at any time before the Confirmation Date, and all debts of the kind specified*

*in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (i) a proof of claim*

*based on such debt is filed or deemed filed under Section 501 of the Bankruptcy Code; (ii) a Claim*

*based on such debt is Allowed under Section 502 of the Bankruptcy Code; or (iii) the holder of a*

*Claim has accepted the Plan.*

**D.      PERMANENT INJUNCTION**

*Except as provided in the Plan or in the Confirmation Order, as of the Confirmation Date,*

*all Persons that have held, currently hold or may hold a Claim or other debt or liability that is*

*stayed, impaired, discharged or terminated pursuant to the terms of the Plan are permanently*

*enjoined from taking any of the following actions either (x) against the Debtors, the Estate, or*

*their property on account of all or such portion of any such Claims, Interests, debts or liabilities*

*that are stayed, impaired or terminated, or (y) against any Person with respect to any Available*

*Claim and/or Defense, which is waived, released or exclusively retained under the Plan:  (a)*

*commencing or continuing, in any manner or in any place, any action or other proceeding; (b)*

*enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or*

*order, (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of*

*subrogation or recoupment of any kind against any debt, liability or obligation due; and (e)*

*commencing or continuing, in any manner or in any place, any action that does not comply with or*

*is inconsistent with the provisions of the Plan.  To avoid any doubt, nothing in the Plan shall be*

*construed or is intended to affect, enjoin, modify, release or waive any claims, rights, and actions*

*that a third party may have against a person other than the Debtors or the Debtors.  Unless*

*otherwise provided in the Plan or the Confirmation Order, all injunctions and stays provided for*

*in the Chapter 11 Case pursuant to Sections 105 and 362 of the Bankruptcy Code or otherwise in*

*effect on the Confirmation Date, shall remain in full force and effect until the Effective Date.*

*From and after the Effective Date, except as provided in the Plan or in the Confirmation Order, all*

*Persons are permanently enjoined from, and restrained against, commencing or continuing in any*

Case: 10-40297   Doc# 103   Filed: 03/24/10   Entered: 03/24/10 18:28:16   Page 51 of 68
53604-002\DOCS_SF:69786.3

DISCLOSURE STATEMENT IN SUPPORT OF
JOINT PLAN OF LIQUIDATION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

*court any suit, action or other proceeding, or otherwise asserting any claim or interest, (a) seeking*
*to hold (i) the Debtors or the Estate, or (ii) the property of the Debtors or the Estate, liable for any*
*Claim, obligation, right, interest, debt or liability that has been addressed or released pursuant the*
*Plan.*

**E.**     **EXONERATION AND RELEASE**

The Debtors, and each of their respective Agents, shall not be liable, other than for gross negligence or willful misconduct, to any holder of a Claim or Interest or any other entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time after the Petition Date in connection with the Chapter 11 Case or the negotiation, formulation, development, proposal, disclosure, Confirmation or implementation of the Plan.  The Debtors, and each of their respective Agents may reasonably rely upon the opinions of their respective counsel, accountants, and other experts and professionals and such reliance, if reasonable, shall conclusively establish good faith and the absence of gross negligence or willful misconduct; provided however, that a determination that such reliance is unreasonable shall not, by itself, constitute a determination or finding of bad faith, gross negligence or willful misconduct.

**IX.**

**KEY PLAN PROVISIONS**

**A.**     **SOURCE OF PLAN FUNDING**

The Plan will be funded by the Debtors' cash on hand and the liquidation of the Estate Assets.  The Debtors' cash on hand as of the Petition Date is expected to total approximately $1,400,000.  The liquidation of Clover DHDA is anticipated to generate approximately $3.1 million over a period of two to three years.

**B.**     **PRIORITY CLAIMS**

The Debtors estimate that there are approximately $66,435.89 in priority claims.  The Debtors currently estimate that unpaid Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will total approximately $66,435.89 and $0, respectively.

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1 | **C.**     **ADMINISTRATIVE CLAIMS**

2      The Debtors estimate accrued and unpaid administrative expenses in this case will be

3 approximately $300,000 as of the Effective Date, including claims of professionals (net of

4 retainers).

5                  **X.**

6             **FEASIBILITY**

7      The Bankruptcy Court must determine that the Plan is feasible and is not likely to be

8 followed by liquidation or further reorganization of the Debtors. To determine whether the Plan

9 meets this requirement, the Debtors have analyzed the ability of the Estate to meet the obligations

10 under the Plan. The Debtors have sufficient cash on hand to meet their obligations under the Plan.

11 The Debtors currently have cash in the amount of approximately $1,400,000. This is sufficient cash

12 in order to fund the Debtors' obligations under the Plan and to make the Plan economically feasible.

13                  **XI.**

14             **RISK FACTORS**

15      Although the Debtors believe that the Plan is confirmable, there is a risk that the

16 Bankruptcy Court will decide not to confirm the Plan. There are also some risks associated with

17 the performance of the Plan. In particular, distributions to holders of Allowed General Unsecured

18 Claims are chiefly driven by the success of the liquidation of the Development Entities, including

19 Clover DHDA. Given the depressed and changing nature of the real estate markets, as well as the

20 credit markets upon which the real estate markets rely, there is no guarantee that the Debtors will

21 realize anticipated values from the Estate Assets.

22      Specifically, the projected value of the Debtors' interests in Clover DHDA is dependent on

23 significant progress in obtaining entitlements and approval of a tentative development map for the

24 property. This process is dependent on governmental and regulatory approvals that may not be

25 timely obtained or that may require significant revisions to the Debtors' development strategy and

26 additional costs. There is no guarantee that the Debtors will be able to successfully obtain the

27 requisite approvals within the time frame currently contemplated.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Even assuming that all necessary entitlements are obtained for Clover DHDA's assets, there remains a significant risk that the real estate market will remain depressed and that the Debtors will not be able to realize any significant equity value out of the property. The real estate market is inherently unpredictable. The Debtors' valuation of the estate's interests in Clover DHDA assumes that market prices for new homes reset to 80% of home values in 2006-2007. If that does not happen, the Debtors would stand to recover much less (and perhaps nothing) on account of their interests in Clover DHDA. The result would be that recoveries by unsecured creditors under the Plan would be significantly reduced or even eliminated.

Finally, there is a risk that Clover DHDA will be unable to make debt service payments, which would lead to defaults under various seller notes. Such default would entitle the lenders to foreclose on Clover DHDA's assets, leaving nothing for the Debtors' estate. The Debtors currently project that Clover DHDA will have sufficient funds to satisfy its ongoing obligations, but there is a risk that a default could occur.

Additionally, because uncertainty exists with respect to the allowance of Claims, there may be significant delay before any distribution is made on account of Allowed Claims and it is possible that the pool of Allowed Claims is ultimately determined to be substantially higher than anticipated herein, which could further dilute recoveries by holders of Allowed General Unsecured Claims.

However, the Debtors believe each of the foregoing risks is equally present in, and significantly greater to Creditors in, the context of a case under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors urge Creditors to support the Plan.

## XII.

## CERTAIN FEDERAL TAX CONSEQUENCES

### A. TAX CONSEQUENCES OF PLAN

THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL TAX CONSEQUENCES THAT ARE

DESCRIBED HEREIN AND OTHER FEDERAL, STATE OR LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN.  SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. ACCORDINGLY, AS NOTED ABOVE, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.  THE BELOW SUMMARY OF TAX CONSEQUENCES IS NOT INTENDED TO BE AND IS NOT TAX ADVICE.

THE DEBTORS DO NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN.  CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTORS.

**B.** **FEDERAL INCOME TAX CONSEQUENCES TO CREDITORS**

In general, each holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property that such holder receives under the Plan in satisfaction of its Claim (other than in respect of any Claim for accrued but unpaid interest), and (ii) such holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

The character, amount and timing of income, gain or loss the holders of Allowed Claims recognize as a consequence of the distributions under the Plan will depend upon, among other things, (i) the manner in which the Claim was acquired, (ii) the length of time the Claim was held, (iii) whether the Claim was acquired at a discount, (iv) whether the holder of an Allowed Claim has taken a bad debt deduction for the Claim, (v) whether the holder has previously included accrued but unpaid interest with respect to the Claim, (vi) the holder's method of tax accounting, (vii) whether the Claim is an installment obligation under the tax laws, and (viii) the type of consideration

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

received or deemed received by the holder in exchange for its Claim. In addition, in the event interest is paid on the Claim, the holder may have interest income. Therefore, holders of Allowed Claims should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such holders as a result thereof.

Depending on the nature of the claim, the Debtors may be required to file information returns with the appropriate taxing agencies to report payments to the holders of Allowed Claims. In order to make Distributions, the Debtors will require that holders of Allowed Claims provide certain federal income taxpayer information, such as the holder's taxpayer identification number.

## C.  FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

In general, the Internal Revenue Code provides that a debtor in a bankruptcy case is not taxable on cancellation of debt ("COD") income, but must reduce certain of its tax attributes (such as its net operating loss ("NOL") carryforwards and its tax basis in its assets) by the amount of COD income. COD income is generally equal to the amount of the debt less the fair market value of the collateral and/or the consideration given. Any reduction in tax attributes does not occur, however, until the first day of the following taxable year after the exclusion of the COD income. Accordingly, the Debtors' tax attributes may offset any taxable income or gain recognized in the year of discharge. Such offset may be limited, however, in the case of alternative minimum tax. In some cases, a debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

Under the Plan, the Debtors will be revested with the Estate Assets, including any available tax attributes, for the benefit of Creditors. Such revesting of the Estate Assets will not be treated as a taxable event for U.S. federal income tax purposes. However, any subsequent disposition of an Estate Asset could result in the Debtors' recognizing gain or income, depending in part on the value of such assets as of the date of transfer. Due to the Debtors' reported and anticipated NOLs and NOL carryforwards and the tax basis in such assets, however, the Debtors do not anticipate that any significant tax liability will be incurred from and after the Effective Date on account of the Estate Assets.

38604-002\DOCS_SF:69986v3
Case: 10-40297   Doc# 103   Filed: 03/24/10   Entered: 03/24/10 18:28:46   Page 56 of
68

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# XIII.

## LIQUIDATION ANALYSIS

Pursuant to Bankruptcy Code section 1129(a)(7), unless there is unanimous acceptance of the Plan by an impaired Class, the Debtors must demonstrate, and the Bankruptcy Court must determine that, with respect to such Class, each holder of a Claim or Interest will receive property of a value, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is commonly referred to as the "Best Interests Test." The Debtors submit that the Plan satisfies the Best Interests Test.

The Plan provides greater recovery to the holders of Allowed Claims than such holders would receive in a liquidation under chapter 7 primarily because Mr. Heaton will help liquidate the Estate Assets. Mr. Heaton is intimately familiar with the Estate Assets, including the assets owned by the Development Entities. Further, as most of the Estate Assets and the assets of the Development Entities are real estate assets, Mr. Heaton's expertise as a real estate developer makes him particularly qualified to liquidate the Estate Assets. A chapter 7 trustee likely will not have any knowledge of the Estate Assets and, unless the trustee is a real estate veteran like Mr. Heaton, will not possess the same knowledge of real estate markets. Accordingly, Mr. Heaton likely is in a much better position to maximize the value of the Estate Assets than a chapter 7 trustee.

The Plan also avoids a layer of administrative expense and delay associated with the appointment of a chapter 7 trustee, while increasing the efficiency of administering the Debtors' assets for the benefit of Creditors. In a chapter 7 case, the chapter 7 trustee would be entitled to seek a sliding scale commission based upon the funds distributed by such trustee, even though the Debtors have already accumulated certain funds and incurred certain expenses associated with generating such funds. Accordingly, the Debtors believe that there is a reasonable likelihood that Creditors would "pay again" for the funds accumulated by the Debtors, since the chapter 7 trustee would be entitled to receive a commission in some amount for all funds distributed, including possibly the funds handed over to the chapter 7 trustee by the Debtors.

In addition, a chapter 7 trustee would employ legal counsel and other professionals and advisors such as accountants. If the Debtors' current counsel and advisors were not retained by the

36604-002\DOCS_SF:69980.7

chapter 7 trustee or they decided not to take on such engagements, the chapter 7 trustee would employ new professionals who would have to expend significant time and resources to "get up to speed." These additional administrative expenses likely would be substantial and would be paid ahead of general unsecured creditors.

It is also anticipated that a chapter 7 liquidation would result in delay in distributions to Creditors. Among other things, a chapter 7 case would trigger a new bar date for filing Claims that would be more than 90 days following conversion of the case to chapter 7. Fed. R. Bankr. P. 3002(c). Furthermore, any chapter 7 trustee would need time to analyze the Estate Assets and, probably, learn the real estate market. Hence, a chapter 7 liquidation would not only delay distributions, but raise the prospect of additional Claims that were not asserted in the chapter 11 case.

The Debtors have prepared projections attached as Exhibit A hereto comparing a chapter 7 liquidation with anticipated recoveries under the Plan. The liquidation analysis makes clear that unsecured creditors will recover substantially more (26.4% versus 3.1%) under the Plan than they would in a chapter 7 context. The liquidation analysis is provided solely to disclose the effects of a hypothetical liquidation of the Debtors under chapter 7 of the Bankruptcy Code. While the liquidation analysis is necessarily presented with numerical specificity, if the Debtors were liquidated under chapter 7, the actual liquidation proceeds could vary, perhaps substantially, from the amounts set forth on Exhibit A hereto. No representation or warranty can be or is being made with respect to the actual proceeds that could be received in a chapter 7 liquidation and/or under the Plan. Nothing contained in the analyses set forth in Exhibit A is intended or may constitute a concession or admission of the Debtors for any other purpose.

In sum, the Plan proposed by the Debtors presents a better alternative to Creditors than a chapter 7 liquidation because the Plan will allow Creditors to realize more value from the Estate Assets and to do so more efficiently than a chapter 7 trustee.

///

///

///

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## XIV.

## <u>CONCLUSION</u>

The Debtors believe that the Plan is in the best interests of Creditors and urge you to vote to accept the Plan.

[signature page follows]

73604-002\DOCS_SF:69986.3

Dated:    March 24, 2010

                                    By:    /s/ Doyle D. Heaton
                                           Doyle D. Heaton

Dated:    March 24, 2010

                                    By:    /s/ Mary K. Heaton
                                           Mary. K. Heaton

Respectfully submitted by,

PACHULSKI STANG ZIEHL
    & JONES LLP

By:    /s/ Maxim B. Litvak
       Maxim B. Litvak
       Attorneys for Debtors and Debtors in Possession

## *LIST OF EXHIBITS TO DISCLOSURE STATEMENT*

**Exhibit A:**    Liquidation Analysis and Chapter 11 Projections

**Exhibit B:**    Description of Development Entities

**EXHIBIT A**

**LIQUIDATION ANALYSIS AND CHAPTER 11 PROJECTIONS**

## LIQUIDATION ANALYSIS AND CHAPTER 11 PROJECTIONS FOR DOYLE D. AND MARY K. HEATON

| | Chapter 7 Liquidation | Chapter 11 |
|---|---|---|
| **Claims Analysis** | | |
| Secured Claims: (Rental Properties + 1 Lot) | | |
| 1st Mortgage Holders | 7,713,859 | 7,713,859 |
| 2nd Mortgage Holders | 5,514,169 | 5,514,169 |
| Total Secured Claims | $13,228,028 | $13,228,028 |
| | | |
| Priority Claims | $66,436 | $66,436 |
| | | |
| Unsecured and Deficiency Claims: | | |
| Unsecured Claims | 4,413,264 | 4,413,264 |
| Deficiency Claims: | | |
| Guarantees of LLC Loans - Note (1) | 98,654,112 | 98,654,112 |
| Less: Recovery From LLC's - Note (2) | (40,030,920) | (55,281,060) |
| Less: Wells Fargo Bank Waiver | (36,000,000) | (36,000,000) |
| Net Deficiency Claims | 22,623,192 | 7,373,052 |
| Net Unsecured and Deficiency Claims | $27,036,456 | $11,786,316 |
| | | |
| **Asset Analysis** | | |
| Secured Creditors: | | |
| Proceeds from Sale of Rental Properties + 1 Lot | $8,338,613 | $11,118,150 |
| | | |
| Priority & Unsecured Creditors: | | |
| Cash | 1,400,000 | 1,400,000 |
| Clover DHDA LLC Interest - Note (3) | 0 | 3,147,307 |
| Total Cash Available before Fees & Expenses | 1,400,000 | 4,547,307 |
| | | |
| Trustee Fees & Expenses | 292,158 | 0 |
| Professional Fees | 200,000 | 300,000 |
| Management Fee (1 Year) | 0 | 300,000 |
| DRG Builders Inc. Management Fee (1 Year) | 0 | 180,000 |
| Success Fee: Clover DHDA LLC Interest Sale | 0 | 629,461 |
| Total Fees and Expenses | 492,158 | 1,409,461 |
| Net Cash Available to Unsecured Creditors & Priority Claims | $907,842 | $3,137,846 |
| | | |
| **Recovery Projections** | | |
| Secured Claims: | | |
| *1st Mortgage Holders:* | | |
| Claims Paid | $7,071,914 | $7,713,859 |
| Total Claims | 7,713,859 | 7,713,859 |
| Recovery Percentage | 91.7% | 100.0% |
| | | |
| *2nd Mortgage Holders:* | | |
| Claims Paid | $1,266,699 | $3,404,291 |
| Total Claims | 5,514,169 | 5,514,169 |
| Recovery Percentage | 23.0% | 61.7% |
| | | |
| *Total Secured Claims:* | | |
| Claims Paid | $8,338,613 | $11,118,150 |
| Total Claims | 13,228,028 | 13,228,028 |
| Recovery Percentage | 63.0% | 84.0% |
| | | |
| Priority Claims: | | |
| Claims Paid | $66,436 | $66,436 |
| Total Claims | 66,436 | 66,436 |
| Recovery Percentage | 100.0% | 100.0% |
| | | |
| Unsecured Creditor Claims: | | |
| Claims Paid | $841,406 | $3,071,410 |
| Net Claims | 27,036,456 | 11,786,316 |
| Recovery Percentage | 3.1% | 26.1% |

**NOTES**
(1) See Schedule "Analysis of Unsecured Deficiency Claims"
(2) See Schedule "Estimated Values of Real Estate Assets Held by Development Entities (excluding Oak Brook Partners II LLC and Clover DHDA LLC)"
(3) 29.958% LLC interest. This is an estimated future value in 2-3 years and assumes the project is successfully entitled and market prices reset to 80% of home values in 2006-2007.

# LIQUIDATION ANALYSIS AND CHAPTER 11 PROJECTIONS FOR DOYLE D. AND MARY K. HEATON

## Analysis of Unsecured Deficiency Claims

| | | |
|---|---:|---|
| Aggregate General Unsecured Claims (per Schedule F) | $118,661,304 | |
| Adjustments: | (6,490,000) | WFB - Oakbrook Loan (project has positive equity) |
| | (2,614,507) | WFB - PVP Loans (secured by rental properties) |
| | (1,292,336) | WFB - ABBA loan (part of settlement agreement) |
| | (855,811) | Bank of Marin - (secured by Cherry Lane Lot) |
| | (262,566) | Bank of Marin - Technology Lane (secured) |
| | (106,206) | First Republic Bank LOC (secured) |
| | (3,972,593) | Loans on rental properties transferred to others |
| **Net Projected Unsecured Claims** | **$103,067,286** | |

### Itemized Listing of Unsecured Claims

| | Debtor Direct Obligations | Debtor Guarantee Obligations |
|---|---:|---:|
| AICCO Inc. | $83,641 | |
| American Motorists Insurance Company | $200,000 | |
| Bank of Marin | | $5,980,731 |
| CBIC | $127,500 | |
| Central Pacific Bank | | $3,038,328 |
| City National Bank | $391,915 | |
| CV Anthony II, LLC | $827,612 | |
| Donna Goldberg | $200,000 | |
| Exchange Bank | $353,594 | |
| First Republic Bank | | $14,321,593 |
| Foundation Bank | | $4,000,000 |
| Gonsalves and Santucci Inc. | $84,400 | |
| Home Street | | $4,911,798 |
| Insco Dico Group | $0 | |
| Jan Berkompas | $400,000 | |
| John and Andrea Barella | $762,691 | |
| Meadow Creek, LLC | $93,348 | |
| Mechanics Bank | $388,563 | |
| Michael J. Goldfarb Enterprises | $500,000 | |
| Regal Bank | | $6,359,434 |
| Wells Fargo Bank | | $60,042,228 |
| **Totals** | **$4,413,264** | **$98,654,112** | **$103,067,376** |

3/24/2010

# LIQUIDATION ANALYSIS AND CHAPTER 11 PROJECTIONS FOR DOYLE D. AND MARY K. HEATON

**Estimated Values of Real Estate Assets Held by Development Entities**
**(excluding Oak Brook Partners II LLC and Clover DHDA LLC)**

| | Property Name | Description | Gross Market Value | Net Market Value | Net Impaired Value | Foot notes | Lender | Debt Balance 11/30/2009 | Deficiency Claim | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Net Market Value | Impaired Value |
| **Development Entities** | | | | | | (1) (2) | | | | |
| Southgate Partners LLC | Southgate 1 | Homes (2) and lots (13). | 2,070,636 | 1,925,691 | 1,444,269 | | Wells Fargo Bank | 2,972,965 | (1,047,274) | (1,528,696) |
| Sonoma-Napa Partners LLC | Glenview | Homes (1) and lots (26). | 1,620,000 | 1,506,600 | 1,129,950 | | Wells Fargo Bank | 9,975,863 | (8,469,263) | (8,845,913) |
| Sonoma-Napa Partners LLC | Oak Leaf Ranch | Homes (9) and lots (15). | 6,406,827 | 5,958,349 | 4,468,762 | | Wells Fargo Bank | 14,619,855 | (8,661,506) | (10,151,093) |
| Mardel LLC | Seven Hills | Homes (8) | 5,177,354 | 4,814,939 | 3,611,204 | | Wells Fargo Bank | 5,867,047 | (1,052,108) | (2,255,843) |
| Mardel LLC | Southgate 2 | Homes (7) and lots (8). | 4,459,183 | 4,147,040 | 3,110,280 | | Wells Fargo Bank | 11,028,744 | (6,881,704) | (7,918,464) |
| Mardel LLC | Southgate 3 | Lots (75) | 5,250,000 | 4,882,500 | 3,661,875 | | Wells Fargo Bank | 15,577,754 | (10,695,254) | (11,915,879) |
| | | | 24,984,000 | 23,235,120 | 17,426,340 | | Total Wells Fargo Bank | 60,042,228 | (36,807,108) | (42,615,888) |
| HWR LLC | Highland Trail | Homes (3) and lots (3) | 2,550,000 | 2,371,500 | 1,778,625 | | First Republic Bank | 4,801,593 | (2,430,093) | (3,022,968) |
| Walden Park Associates LLC | Walden Park | Land only | 11,500,000 | 10,695,000 | 8,021,250 | (3) | First Republic Bank | 9,520,000 | (1,255,000) | (1,498,750) |
| | | | 14,050,000 | 13,066,500 | 9,799,875 | | Total First Republic Bank | 14,321,593 | (1,255,093) | (4,521,718) |
| Corona Road Associates LLC | Corona Road (Matelli & Chiosi) | Lots (50) | 4,050,000 | 3,766,500 | 1,395,000 | (4) | Bank of Marin | 4,454,924 | (688,424) | (3,059,924) |
| D G & H Developers, LLC | Windsor Lofts | Land only | 1,600,000 | 1,488,000 | 1,116,000 | | Bank of Marin | 1,525,807 | (37,807) | (409,807) |
| | | | 5,650,000 | 5,254,500 | 2,511,000 | | Total Bank of Marin | 5,980,731 | (726,231) | (3,469,731) |
| Antinorri / Normandy Park | Normandy Park | Commercial project | 5,200,000 | 4,836,000 | 3,627,000 | | Regal Bank | 6,359,434 | (1,523,434) | (2,732,434) |
| Josephine Parc - Homes | Josephine Parc | Finished homes (3) | 3,150,000 | 2,929,500 | 2,197,125 | | Foundation Bank | 4,000,000 | (1,070,500) | (1,802,875) |
| Josephine Parc - Lots | Josephine Parc | Finished lots (17) | 3,400,000 | 3,162,000 | 2,371,500 | | Home Street | 4,911,798 | (1,749,798) | (2,540,298) |
| Adobe Partners LLC | Technology Lane | Office bldg. | 3,008,000 | 2,797,440 | 2,098,080 | | Central Pacific Bank | 3,038,328 | (240,888) | (940,248) |
| **Total Development Entities** | | | 59,442,000 | 55,281,060 | 40,030,920 | (1) (2) | | 98,654,112 | (43,373,052) | (58,623,192) |
| **Total Rental Properties + 1 Lot** | see Schedule A for detail | | 11,955,000 | 11,118,150 | 8,338,613 | | | | | |
| **Total** | | | 71,397,000 | 66,399,210 | 48,369,533 | | | | | |

## NOTES

(1) The Debtors have assumed an impairment of value equal to 25.00% in the context of a liquidation of the Development Entities that is effectuated without the benefit of the Debtors' knowledge and assistance. In a chapter 7 case, the trustee is likely to abandon the Debtors' interests in the Development Entities and the assets thereof then will be liquidated through bank foreclosures or deeds in lieu of foreclosures. The Debtors estimate that bank-owned sales of the assets of the Development Entities will yield 25.00% less value than an orderly sale process handled by the Debtors.

(2) The Debtors have assumed 7.0% selling costs and expenses in computing the Net Market Value and Net Impaired Value.

(3) The debt balance for First Republic Bank as to Walden Park Associates LLC ("Walden Park") listed above does not include First Republic Bank's projected deficiency claim associated with HWR LLC ("HWR"), which claim is secured by a second deed of trust against the assets of Walden Park. When the total debt owed to First Republic Bank as to Walden Park and HWR is measured against the value of the assets of these development entities, there is no equity value available to the Debtors' estates associated with either Walden Park or HWR.

(4) The Debtors have assumed an impairment of value equal to 63.00% in the context of a liquidation of this asset based on the current unentitled condition of the property.

# EXHIBIT B

## DESCRIPTION OF DEVELOPMENT ENTITIES

**Adobe Partners, LLC:**
Description:    Developer of Technology Lane Business Center (20 office/warehouse condominiums in Petaluma, CA). Estimated fair market value is approximately $3,000,000.
Project Status:  Construction of building is mostly completed. 9 of 20 units have been sold.
Lender:        Central Pacific Bank. Current loan balance is approximately $3,038,328. Project is currently in foreclosure proceedings.


**Cherry Lane & Associates, Ltd.**
Description:    Developer of various residential real estate projects.
Project Status:  No current active projects
Lender:        No secured loans outstanding


**Clover DHDA LLC**
Description:    Developer of Riverdale ranch raw land parcels in Cloverdale, CA. 200+/- potential new homes. Estimated fair market value is approximately $5,200,000.
Project Status:  Project is currently seeking development approvals from City of Cloverdale.
Lender:        Seller financing. $5,925,000 approximately outstanding.


**Corona Road Associates LLC**
Description:    Developer of Corona Road raw land parcels in Petaluma, CA. 40+/- potential new homes. Developer of N. McDowell Blvd raw land parcel in Petaluma, CA. Estimated fair market value is approximately $4,300,000.
Project Status:  Project is currently seeking development approvals from City of Petaluma.
Lender:        Bank of Marin $4,454,924 approximately outstanding on Corona Road parcels. Exchange Bank $353,594 approximately outstanding on N. McDowell Blvd parcel.


**Delco Builders & Developers, Inc.**
Description:    Operator of a homebuilding company
                10% membership interest in Cherry Lane Associates, LLC
                10% membership interest in Petaluma Ventures, LLC
                5% membership interest in Sonoma-Napa Partners, LLC
Project Status:  No current active projects
Lender:        No loans outstanding


**DG & H Developers LLC**
Description:    Developer of American Way raw land parcels in Windsor, CA.
Project Status:  Raw land, no construction started. Estimated fair market value is approximately $1,600,000.
Lender:        Bank of Marin $1,525,807 approximately outstanding.

\3604\002\DOCS_SF:69980.5

**HWR LLC**
Description:   Developer of Highland Trail residential development in Hayward, CA.
Project Status: 7 of 10 homes constructed, 5 sold.  Estimated fair market value is approximately $2,550,000.
Lender:       First Republic Bank $4,801,593 approximately outstanding


**Mardel LLC**
Description:   Developer of Southgate phases 2&3 residential development in Petaluma, CA (138 homes) and Seven Hills residential development in Castro Valley, CA (16 homes).
                100% membership interest in Del Nova, LLC
                75% membership interest in Southgate Partners, LLC
Project Status: Southgate:  55 homes completed, 49 sold.   Estimated fair market value for the Southgate II is $4,400,000 and for Southgate III is $5,200,000.
                Seven Hills:  8 homes completed, 8 under construction, 12 sold.   Estimated fair market value for Seven Hills is approximately $5,100,000.
Lender:       Wells Fargo Bank $20,887,930 approximately outstanding – Southgate 2&3 (secured)
                Wells Fargo Bank $4,509,836 approximately outstanding – Seven Hills (secured)


**Oak Brook Partners II LLC**
Description:   Developer of ABBA self storage facility in Concord, CA
Project Status: Construction of the project is completed.  Litigation is currently underway between certain partners.  Estimated fair market value for the facility is approximately $7,000,000. (This project is in the process of being appraised and the value is subject to a settlement pending with various partners).
Lender:       Wells Fargo Bank $6,490,000 approximately outstanding


**Petaluma Ventures, LLC**
Description:   Owns six residential rental properties.
Lenders:      America's Servicing Company and Aurora Loan Services with second deeds of trust secured by  property to Heritage Bank and Wells Fargo Bank.


**Sonoma-Napa Partners, LLC**
Description:   Developer of Oak Leaf Ranch residential development in Napa, CA (45 homes) and Glennview residential development in Santa Rosa, CA (49 homes).
Project Status: Oak Leaf Ranch: 26 homes completed, 4 under construction, 22 sold
                Glennview:  23 homes completed, 22 sold.  Estimated fair market value is approximately $6,400,00 for Oak Leaf Ranch and approximately $1,600,000 for Glennview.
Lender:       Wells Fargo Bank $8,706,854 approximately outstanding – Oak Leaf Ranch (secured)
Wells Fargo Bank $5,838,704 approximately outstanding – Glennview (secured)


**Southgate Partners LLC**
Description:   Developer of Southgate phase 1residential development in Petaluma, CA (78 homes)
Project Status: 5 homes completed, 65 sold.  Estimated fair market value is approximately $2,000,000.
Lender:       Wells Fargo Bank $2,972,965 approximately outstanding (secured)

Case: 10-40297   Doc# 103   Filed: 03/24/10   Entered: 03/24/10 18:28:46   Page 67 of 68

38604-002\DOCS_SF:69580.3

**Walden Park Associates, LLC**

Description:   Developer of the Walden Park residential development in Walnut Creek, CA (65 townhomes)

Project Status: project is approved by the City of Walnut Creek. No construction has started. Estimated fair market value is approximately $12,000,000

Lender:      First Republic Bank $9,500,000 approximately outstanding


**Washington Associates, LLC**

Description:   Formed for Washington projects.

Project Status: None

Lender:      None


**Windsor Lofts LLC**

Description:   Possible future developer of American property presently in DG&H Developers LLC.

Project Status: None

Lender:      None